UNITED STATES of America, Plaintiff–Appellee,

v.

**John Ray BONDS (91–3610); Mark Verdi (91–3609); and Steven Wayne Yee (91–3608), Defendants–Appellants.**

Nos. 91–3608, 91–3609, 91–3610.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 11, 1992.

Decided Dec. 15, 1993.

Rehearing and Suggestion for Rehearing En Banc Denied Feb. 18, 1994.

---

James R. Wooley, Asst. U.S. Atty. (argued & briefed), Craig S. Morford, Cleveland, OH, for U.S.

Ronald L. Kuby and William M. Kunstler (argued), Peter J. Neufeld, Barry C. Scheck (argued & briefed), Benjamin Cardozo School of Law, New York City, for Steven Wayne Yee.

Peter J. Neufeld, Barry C. Scheck (argued & briefed), Benjamin Cardozo School of Law, New York City, for Mark S. Verdi.

Peter J. Neufeld, New York City, Terry H. Gilbert (briefed & argued), Friedman & Gilbert, Cleveland, OH, Barry C. Scheck (argued & briefed), Benjamin Cardozo School of Law, New York City, for John Ray Bonds.

Before: KENNEDY and BATCHELDER, Circuit Judges; and ENGEL, Senior Circuit Judge.

BATCHELDER, Circuit Judge.

On February 27, 1988, David Hartlaub was gunned down in his van as he stopped at a bank near the Sandusky Mall in Perkins Township, Ohio, where he planned to make a night deposit of cash from the music store he helped manage. The killers apparently had no interest in robbery; police found the deposit bag containing some four thousand dollars on the seat of the van. Three individuals—Wayne Yee, Mark Verdi and John Ray Bonds—were indicted in connection with the crime, tried, and convicted of conspiracy (18 U.S.C. § 371) and federal firearms offenses (26 U.S.C. § 5861(d) and 18 U.S.C. § 922(g)(1)). At trial, the Government's theory for the shooting was that the gunmen, members of the Hell's Angels motorcycle gang, had mistaken Mr. Hartlaub's yellow van for an identical van driven by a local member of a rival motorcycle gang, the Out-

laws, whom the gunmen had allegedly planned to "hit" in retaliation for the shooting of a Hell's Angels member by an Outlaw the previous year in Joliet, Illinois. The defendants also claim that this is a case of mistaken identity—theirs—and challenge their convictions, claiming the Government's evidence to be either flawed, circumstantial, or both. Among the issues we must confront in this appeal is an issue of first impression for this court: whether the district court erred in admitting expert testimony concerning deoxyribonucleic acid (DNA) evidence in the trial of these defendants. For the reasons set forth below, we affirm the defendants' convictions.

## I. Facts

No bystanders saw the shooting. However, Douglas Waratuke, another music store employee, had followed Mr. Hartlaub to the bank and saw Mr. Hartlaub lying on the ground next to the van when Waratuke arrived at the bank. When Waratuke went to get out of his car, however, a man ran up and put a gun to Waratuke's head through the half-open window and ordered him to stay in the car. Based on Mr. Waratuke's description of the gunman as 25–27 years old, 5' 11", 165 pounds, with a "lanky build" and a "Hispanic appearance," the police made a sketch. Four other bystanders saw the same man and gave similar descriptions. One, Elizabeth Graf, also saw the getaway car, which she described to the police as a cream or tan color Buick, four door, dirty but in good condition.

After the Hispanic-looking man ran away, apparently heading for a nearby hotel, Mr. Waratuke saw an arm reach out of the van and close the door; the occupant then drove off with the van. Police later found the van abandoned behind the hotel with its engine still running and lights on. The gun used in the shooting, a MAC–11 9–mm semi-automatic pistol fitted with a homemade silencer and a multi-round clip with a plastic garbage bag taped on to catch the spent cartridges, lay on the floor between the seats. The gun's serial number had been obliterated; however, the FBI was later able to "raise" the serial number. The gun turned out to have been owned previously by Donald Myers, a former roommate of defendant Yee, who had owned two such guns and testified that they had been stolen from his car when it was parked outside their apartment.

Both the gun and the van's carpet were spattered with blood. Serology tests showed that the blood was not Mr. Hartlaub's, but rare enzymes identified in the spattered blood, which only appear in about 1% of caucasian males, matched those found in Mr. Bonds's blood. Most of the blood in the van had dripped between the front seats; shortly after the murder Mr. Bonds wore his right arm in a sling, and it was later established that he had a serious ricochet wound which evidently bled between the seats as he drove the van that night.

A few minutes after the shooting, two officers stopped a car for making an illegal turn about two miles from the bank. The car, which was headed away from the bank, had Defendant Mark Verdi at the wheel, Mr. Yee in the front passenger seat, and a third man in the back seat. As soon as the car was stopped, Yee got out and told the officers that he owned the car. Officer Jarrett asked Yee to get back in the car and approached the driver. When Verdi was unable to produce his driver's license, Jarrett asked him to step out of the vehicle and accompany him to the police cruiser while they checked the computer to see if Verdi was a licensed Ohio driver. Before placing Verdi in the back of the cruiser, Officer Hemmer patted down Verdi. Hemmer felt a hard round object with a hole in the middle in Verdi's pocket; Verdi said it was a roll of tape. Hemmer did not remove the object to confirm the truth of Verdi's statement because the object did in fact feel like a roll of electrical tape. During conversation, Verdi told the officers that they were "just passing through." A computer check revealed that Verdi was a licensed driver and that the car was registered to Steven Yee. Jarrett confirmed that the passenger that had claimed the car was his was in fact Steven Yee by asking to see Yee's license. The officers did not issue a citation to Verdi, nor did they speak to the man in the back seat. Although Jarrett remembers a squad car with siren and lights on drive

past in the opposite direction (toward the bank), the officers did not know at the time of the stop that the murder had occurred.

Meanwhile, federal agents monitoring gang activity had received information that the Cleveland Hell's Angels were planning to retaliate against the Sandusky Outlaws for the Joliet shooting, at which Bonds had been present. The agents knew that Yee was a member of the gang and that Bonds and Verdi were prospective gang members, and when they learned of the murder, and of the subsequent stop of Yee and Verdi in Sandusky near the crime scene, the agents believed they were on the right track. They suspected that Bonds had shot Hartlaub in the van and driven off, that Yee was the "Hispanic looking" man who had confronted Waratuke and the others after the shooting, and that Verdi had picked the two up in Yee's car in back of the hotel after Bonds arrived in the van. Bonds, the agents believed, was the man later seen in the back of Yee's car during the police stop.

On March 3, federal, state and local officers met with a federal attorney to discuss the investigation. Present were, among others, FBI Special Agent George Steinbach and federal attorney Michael T. Rae ("AUSA Rae"). The agents discussed obtaining a search warrant for the Yee car; Mr. Rae agreed to help write up an affidavit for that purpose.

After obtaining grand jury subpoenas for the purpose, the agents took photos of Mr. Yee and of his car on March 7. When showed the photos of the car, witness Elizabeth Graf said it was not the same car, that the car she saw at the crime scene was "possibly lighter in color and possibly smaller." Also, by this time, the agents had found that the eyewitness descriptions of the gunman at the bank differed somewhat from Yee's actual appearance. They had found Yee to be of Chinese ancestry, age thirty-two, height 6' 3", 225 pounds, with black hair and brown eyes; Yee usually wore round wire-rim glasses.

On March 9, Eastlake, Ohio detective Tom Doyle searched Mark Verdi's home pursuant to a state warrant, looking for bank documents in connection with an unrelated crime.

Doyle had known Verdi for over fifteen years and knew him to be connected with the Hell's Angels; he also had learned a few days earlier that Perkins Township police suspected Verdi was involved in the Hartlaub murder. Before he executed the warrant, Doyle, as was his practice when investigating possible gang-related crimes, had contacted a federal Bureau of Alcohol, Tobacco, and Firearms ("BATF") agent, Steve Wells, who was involved in tracking the Hell's Angels. Agent Wells and FBI Agent Stuart Shoaff told AUSA Rae that they wanted to tag along on Doyle's intended search; Rae opined (wrongly, as we shall see) that they would find nothing of value to the investigation. Nevertheless, Wells and Shoaff decided to accompany Doyle on the search of Verdi's home.

Besides finding evidence of the bank fraud, the state officers searching the house came across several items they believed to be evidence of the Hartlaub murder, including a map opened to Sandusky, black plastic bags and rolls of black electrical tape of the types used to make the plastic "shell catcher" bag and secure it to the murder weapon, and several firearms. The officers also found a briefcase or toolbox containing a grinder (which agents thought Verdi might have used to grind off the murder weapon's serial number), a mask, gloves, and a knife; Detective Doyle characterized these as constituting a "hit kit." Agent Shoaff called AUSA Rae to tell him of the find, and then secured the home while a federal search warrant was obtained.

In preparing the petition for the warrant, AUSA Rae decided to write up the affidavit to support the petition to search Mr. Yee's car as well as Mr. Verdi's home. While Rae apparently had the new information about Yee's actual appearance and Miss Graf's inability to conclusively identify his car, he did not include this in the affidavit; he later said the affidavits were prepared in a hurry and that he had forgotten about the new information. The agents submitted the affidavit to the magistrate along with petitions to search Yee's car and Verdi's home and the magistrate issued the warrants. Before the warrant was executed, several witnesses were

shown a photo array including Yee's picture. None of the witnesses was able either to identify or to exclude any of the individuals whose pictures were included in the array as having been the man they saw at the murder scene. AUSA Rae did not apprise the magistrate of the occurrence or result of the photo array.

Later that day, the agents conducted the second search of Verdi's home. They seized the items they had seen there before, as well as a MAC–11 of the same type as the murder weapon, with its serial number obliterated, a switchblade-type knife, a .45 caliber pistol, and a shirt matching the description of one worn at the crime scene by one of the gunmen.

In Yee's car, which the agents tracked down a few days later, the agents found, among other things, spent shell casings which experts later determined came from the murder weapon, and blood in the back seat which the FBI eventually matched with John Bonds's blood sample by DNA identification. A hair found in the back seat of the Yee car also matched Bonds's hair. Fibers found in the car also matched fibers from a green glove found three weeks after the murder on the side of the road (Route 2) connecting Cleveland and Sandusky. With the glove was found Mr. Hartlaub's van registration and title, an empty box of 9–mm cartridges of the type used in the murder and found in Yee's car (this box was later shown to have been bought at a gun shop near Mr. Yee's apartment), and a loaded revolver. A hair found on the glove matched Mr. Bonds's hair. Fibers found on the glove matched the carpeting in the van; the fibers of the glove itself matched fibers stuck to the tape attaching the cartridge-catcher bag to the murder weapon and also matched fibers found on the shirt seized from Mr. Verdi's home.

On March 16, the grand jury issued a subpoena ordering Mr. Bonds to submit to fingerprints and photographs; he complied. On April 20, another subpoena ordered him to appear for photographs of his bare arms, legs and torso, to see if he showed wounds consistent with those thought to have caused the blood stains in the van. On April 25, Bonds refused to comply, invoking his Fourth and Fifth Amendment rights. After a hearing before a district court judge, Bonds was ordered to comply by the morning of April 27 or be held in contempt. On April 27, Bonds was held to be in contempt and was taken into custody in the Cleveland Federal Courthouse. That evening, Bonds was taken to a jail in Toledo; the plan was to take him to a federal prison in Michigan the next day.

Agents prepared an affidavit seeking to obtain a search warrant for blood and hair samples from Mr. Bonds, which was brought before a federal magistrate judge in Toledo on April 28. The magistrate was satisfied with the reliability of the information and issued the warrant based on a finding of probable cause. The agents seized the samples from Bonds. These samples were the basis for evidence introduced at trial, including evidence that the DNA in Bonds's blood matched the DNA from the blood found in the back seat of Yee's car. Bonds was subsequently indicted, but fled before he could be brought to trial; he was a fugitive for several months before being discovered in Kentucky.

All three defendants were eventually tried to a jury and convicted; Messrs. Verdi and Yee were each sentenced to a total of fifteen years and Mr. Bonds was sentenced to a total of twenty five years.

## II. Admissibility of the DNA Evidence

We first address whether the district court committed reversible error in admitting expert testimony concerning the DNA evidence obtained from the blood sample of defendant Bonds. Although several federal courts have ruled on the admissibility of forensic DNA testimony and evidence, see United States v. Jakobetz, 955 F.2d 786, 794 (2d Cir.), cert. denied, — U.S. —, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); United States v. Two Bulls, 918 F.2d 56 (8th Cir.), vacated (and appeal dismissed after death of appellant), 925 F.2d 1127 (8th Cir.1991); People v. Atoigue, No. CR 91–95A, 1992 WL 245628 (D.Guam.App.Div. Sept. 11, 1992); United States v. Young, 754 F.Supp. 739 (D.S.D. 1990), as have numerous state courts, see, e.g., People v. Castro, 144 Misc.2d 956, 545

N.Y.S.2d 985 (N.Y.Sup.Ct.1989), this is a case of first impression for the Sixth Circuit. We find that the district court did not err in admitting the expert testimony in this case.

### A. Background of DNA Testing

Deoxyribonucleic acid (DNA) is the molecule, found in the nucleus of nearly every cell of every living thing, that houses genetic information.[1] The structure of this molecule in a human provides a unique genetic code for that person; only genetic twins have identical DNA. In some regions of the DNA molecule, scientists have found segments called variable number tandem repeats (VNTRs), which vary greatly among individuals.[2] Accordingly, VNTR genes are called polymorphic because they appear in different forms, called alleles, in different individuals. It is these VNTR genes that are analyzed to determine whether biological material found in body fluid of a known individual can be linked to the DNA found in a body fluid sample of an unidentified crime-scene specimen. The greater the number of matching alleles detected in the crime-scene blood and a suspect's blood, the more probable it is that the suspect is the source of the crime-scene sample. DNA has been heralded because DNA markers—VNTRs—vary much more from individual to individual than do traditional blood serology markers—blood type and enzymes. Therefore, a detailed examination of DNA theoretically can yield a positive association between a suspect's sample and a crime-scene sample.

The technique used by the FBI laboratory in this case[3] involves the use of a molecular biology technique called restriction fragment length polymorphism (RFLP). The RFLP procedure isolates DNA in a blood sample so that scientists can locate the VNTRs in that DNA. Using this technique, molecular biologists can detect differences in DNA by analyzing size and length variations between the VNTR alleles of the suspect's blood and of the crime-scene sample blood. They then compare visually and with a computer program the resulting sizes of the DNA band patterns. Finally, they attempt to determine whether there is a "match" by analyzing whether it is likely or unlikely that a known sample and an unknown sample come from the same source, or whether the results are inconclusive.[4]

After the RFLP procedure is completed and a match is found, the lab makes a statistical estimate of the rarity of the pattern of DNA bands found in the suspect's sample. By conducting DNA studies on FBI agents, the FBI has developed a table of DNA allele frequencies for each of three racial groups— caucasian, black and hispanic—using a "fixed-bin method," in which the lab divides up the size of the alleles into bins. Although these population studies are broken down by racial groups, they are not further divided into ethnic subpopulation within these groups, such as (within the caucasian group) Polish or Italian.[5] The forensic scientist uses these tables to determine the frequency of each allele in the particular suspect's sample. To estimate the frequency of a suspect's overall DNA pattern, the individual allele frequencies are multiplied together, using a multiplication or product rule, to compute an aggregate estimate of the probability that this combination of alleles in the suspect's DNA sample would be encountered in a particular racial population. This comparison

1. See the U.S. Office of Technology Assessment (OTA) Report at 3 (1990), which is appended to magistrate judge's report and recommendation, for an overview of DNA profiling.

2. Although all individuals have the same sequence of nucleotides at these VNTR locations, what differs from person to person is the number of times this sequence repeats itself. Thus, differences in DNA are detected by counting the number of times a particular sequence repeats at that VNTR.

3. The FBI technique was developed in 1987, when the FBI established a research group to

experiment with DNA profiling. In late 1988, the FBI began performing casework. In April 1989, the Bureau issued a formal, brief report on its procedures. This report was modified in May 1990.

4. This RFLP technique is diagrammed in the OTA Report at 5, and outlined by the magistrate judge in his report and recommendation.

5. The table of allele frequencies at issue in this case is the table for caucasians, which was developed from DNA profiles for approximately 225 randomly chosen caucasian FBI agents.

highlights the significance of a DNA "match" by determining the frequency with which the particular genetic traits, or alleles, of the suspect are observed in a particular racial population.[6]

### B. Use of DNA Evidence in this Case

On April 7, 1989, the FBI's DNA laboratory submitted a report stating that there was a "match" of DNA profiles from a bloodstain found in victim David Hartlaub's car and the DNA profiles derived from the blood of defendant Bonds. The FBI then calculated a probability of 1 in 270,000 that an unrelated individual selected randomly from the caucasian population would have a DNA profile matching that of Bonds. In May of 1990, the FBI revised its probability figure to 1 in 35,000. This revised probability estimate was presented to the jury in this case.

Defendants filed a motion to suppress the DNA evidence, and the Government filed a motion to admit the evidence. Because at that time the FBI test results had not yet been published in a peer review journal explaining the FBI's methods and offering data to support the results, defendants moved to discover the predicate data underlying the FBI's unpublished DNA studies and records of the internal proficiency tests that the FBI had conducted. The magistrate judge granted most of the discovery requests. *See United States v. Yee*, 129 F.R.D. 629, 631 (N.D.Ohio 1990). The magistrate judge then conducted a six-week *Frye* hearing [7] to determine whether the proposed experts' trial testimony about the DNA evidence was based on principles generally accepted in the scientific community. During the hearing, the Government called six expert witnesses, the defendants called five expert witnesses, and the court called Dr. Eric Lander as the court's witness. More than 200 exhibits

were introduced relating to the FBI's methods of testing.

At the conclusion of the hearing, Magistrate Judge Carr issued a comprehensive 120–page report and recommendation (R & R), recommending that the Government's motion to admit the DNA evidence be granted and that the defendants' motion to suppress be denied. The district court adopted the magistrate's R & R, *United States v. Yee*, 134 F.R.D. 161 (N.D.Ohio 1991), specifically addressing the three issues raised by defendants in their objections to the R & R: consensus and general acceptance, reliability, and Federal Rule of Evidence 403. The district court found that the Rule 403 argument must be raised at trial.

Before trial, defendants moved for an *in limine* hearing to resolve the Rule 403 ground for exclusion and to expand the *Frye* hearing. The trial court denied the motion for exclusion of the evidence and for another evidentiary hearing, again holding that the Rule 403 challenge must be addressed at trial. At trial, the district court admitted the testimony over the Rule 403 challenge. The district court's orders denying the motion to suppress are now before us on appeal.

### C. Consideration of NRC Report

■ We address first the Government's motion to strike the references in defendants' appellate brief to the report by the National Research Committee (NRC) of the National Academy of Sciences (NAS), entitled "DNA Technology in Forensic Science" [hereinafter NRC Report]. Defendants ask us to take judicial notice of this report for purposes of this appeal. We grant the Government's motion to strike, deny the motion to take judicial notice, and find that we cannot consider this report for purposes of this appeal.

---

6. See the magistrate's report and recommendation for a detailed overview of DNA testing and the FBI's procedure.

7. This circuit has used the test for admissibility of scientific expert testimony established in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923), which requires that the testimony be based on a theory that has "gained general acceptance in the particular field in which it belongs." *Id.* at 1014. Thus, until recently, district courts con-

ducted "*Frye* hearings" prior to trial to determine if certain scientific expert testimony would be based on generally accepted theories and procedures. In a recent ruling, *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), the Supreme Court held that the *Frye* test was superseded by Federal Rule of Evidence 702. *See* discussion *infra* part II.E.

The *Frye* hearing before the magistrate began in June of 1990; the magistrate issued his R & R in October of 1990. The district court adopted the R & R in January of 1991. Defendants were convicted and sentenced, and filed their notices of appeal in 1991. On April 16, 1992, nearly two years after the *Frye* hearing and more than a year after the convictions, the NAS issued the NRC Report. On June 8, 1992, defendants filed their brief on appeal, urging reversal and relying heavily on the report's findings.

The NRC Report examines the FBI's method of declaring DNA matches and of calculating the statistical probability of a suspect's pattern of DNA occurring in a particular population. The report was authored by a committee of scientists in population and molecular genetics, forensic scientists, legal academicians, ethicists, and a federal judge, including Dr. Eric Lander, the court's witness at the *Frye* hearing. Dr. Caskey, a Government witness, was a former member of the committee, and Dr. Kidd and Dr. Budowle, two of the Government's witnesses, were among those who made presentations to the committee and whose views are reflected in the report. The report cites to the published works in the field, including documents discussed at the *Frye* hearing. The report, which was peer-reviewed by a group other than the authors, questions a number of the FBI's procedures. Most significantly, it contends that the FBI's multiplication rule (the rule of multiplying the frequency of the alleles by one another to compute a composite frequency of a suspect's particular DNA pattern) distorts the probability estimates because the rule does not take into account the possibility of "population substructure," a view that racial populations contain ethnic subpopulations (e.g., Italian, Polish, etc.) that have distinct DNA allele frequencies. The report proposes an interim method, called the ceiling method, for performing probability calculations in a way that would compensate for population substructure. Under this proposed ceiling method, defendants argue that the probability of Bonds's DNA pattern being found in the caucasian population in this case would be 1 in 17, not 1 in 35,000 as reported by the FBI. The Government re-sponds that even under the ceiling method, the figure would be 1 in 6,200.

In its motion to strike, the Government argues that this NRC Report was issued more than a year after defendants' convictions and was not part of the record in the district court. The defendants counter that although the report was not part of the district court record, this Court can take judicial notice of this scientific report in determining if scientific testimony is "generally accepted." *See People v. Reilly,* 196 Cal.App.3d 1127, 242 Cal.Rptr. 496, 501 (Cal.Ct.App.1987) (overview of literature outside record can reveal consensus and end case-by-case general acceptance decision).

■ We grant the Government's motion to strike the NRC Report because this report was not available to the magistrate judge at the *Frye* hearing and was not before the magistrate judge or the district court judge when they ruled on the motion to suppress. We cannot consider a report that is not part of the record. *See* Fed.R.App.P. 10(a) (record on appeal consists of "original papers and exhibits filed in the district court, the transcript of proceedings, if any, and a certified copy of the docket entries"); *see also United States v. Allen,* 522 F.2d 1229, 1235 (6th Cir.1975) (court will not consider material in brief that is not in record), *cert. denied,* 423 U.S. 1072, 96 S.Ct. 854, 47 L.Ed.2d 82 (1976). As a panel of this Court stated in *Sovereign News Co. v. United States,* 690 F.2d 569 (6th Cir.1982), *cert. denied,* 464 U.S. 814, 104 S.Ct. 69, 78 L.Ed.2d 83 (1983), "A party may not by-pass the fact-finding process of the lower court and introduce new facts in its brief on appeal." *Id.* at 571. Although this case differs from *Sovereign News* in that this is a criminal appeal, appellate courts hearing criminal matters also have refused to take judicial notice of, or supplement the record with, evidence that was not before the district court. *See United States v. Gonsalves,* 735 F.2d 638, 641 (1st Cir.1984) (letters and notes are not part of record on appeal); *United States v. Bosby,* 675 F.2d 1174, 1181 n. 9 (11th Cir.1982) (appellate court cannot consider an affidavit that was not before district court); *Allen,* 522 F.2d at 1235 (vol-

umes of material not in record cannot enlarge record).

■ While defendants' request that we merely take judicial notice of this report pursuant to Federal Rules of Evidence 201(f)[8] and 104(a)[9] has a certain facial appeal, Federal Rule 201 permits a court to take judicial notice only of facts "not subject to reasonable dispute...." Fed.R.Evid. 201(b). There is no dispute that the NRC Report exists, but there is considerable dispute over the significance of its contents. We acknowledge that several appellate courts have considered the NRC Report retroactively, asked the parties to brief the significance of the report, or remanded for consideration of it. *See, e.g., United States v. Porter*, 618 A.2d 629 (D.C.1992) (remand in part for consideration of NRC Report, which was issued during appeal process); *State v. Anderson*, 115 N.M. 433, 853 P.2d 135 (Ct. App.) (considering NRC Report issued while case on appeal), *cert. granted*, 115 N.M. 145, 848 P.2d 531 (1993); *New Hampshire v. Vandebogart*, 136 N.H. 365, 616 A.2d 483 (1992) (using NRC Report to conclude that probability methods are not generally accepted); *People v. Barney*, 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731 (1992). However, we do not agree with those courts that have considered the NRC Report retroactively or remanded for consideration of it, and we decline to take judicial notice of an article published a year after defendants' convictions were handed down.

■ As the Government points out, if we were to take judicial notice of this article, the Government would be precluded from rebutting the report with expert testimony, as both sides were permitted to do for the

reports and articles submitted to the magistrate judge at the *Frye* hearing. We in essence would be bypassing the fact-finding function of the district court and overriding the requirement that all pertinent evidence be admitted at the evidentiary hearing. Most importantly, if we were to look at new scientific data available to us but not available to the district court that made the admissibility determination, we would not be confining ourselves to *reviewing* the district court's admissibility ruling, but would be making a *de novo* determination based on post-conviction developments or articles. This is not the function of an appellate court.

This scientific report is evidence just as the other scientific reports and exhibits introduced at the *Frye* hearing are evidence; it is not judicial precedent that we must consider retroactively up until the date the decision in this case is handed down. Thus, as noted below, in addressing the admissibility of the DNA evidence presented at trial, we find that the key is whether the testimony met the requirements of Federal Rule of Evidence 702 at the time of the district court's admissibility determination, not whether subsequent events provide evidence that contradicts or calls into question the district court's view at the time of its admissibility ruling.

In any case, we note that the substance of the criticisms in the NRC Report, including the possibility of ethnic substructure, is before us in the form of the testimony from defendants' expert witnesses. Thus, we do consider the substance of the NRC Report's criticisms; we do not consider only the collective opinion of the NRC and the NAS and the synopsis of these criticisms in the report itself.[10]

---

8. Federal Rule of Evidence 201 provides in part:
 (a) **Scope of rule.** This rule governs only judicial notice of adjudicative facts.
 (b) **Kinds of facts.** A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned.
 ....
 (f) **Time of taking notice.** Judicial notice may be taken at any stage of the proceeding.

9. Federal Rule of Evidence 104(a) states in part:

 (a) **Questions of admissibility generally.** Preliminary questions concerning the qualification of a person to be a witness, the existence of a privilege, or the admissibility of evidence shall be determined by the court, subject to the provisions of subdivision (b)....

10. We also note that the defendants' argument that we should merely take judicial notice of the report because the report would shed light on whether the scientific testimony is "generally accepted" is weakened by the Supreme Court's recent ruling in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* —— U.S. ——, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). *See* discussion *infra* part

*D. Standards Used in Admissibility Determination*

For the reasons outlined below, we affirm the district court's admission of the DNA testimony and evidence, although for reasons in addition to those stated by the district court, because the Supreme Court, subsequent to the district court's order, held that the *Frye* test is no longer controlling and that Rule 702 now governs.

*1. Standard of Review*

 We review the trial court's admission of testimony and other evidence under the abuse of discretion standard. *Mitroff v. Xomox Corp.*, 797 F.2d 271, 275 (6th Cir. 1986). Even if the trial court abuses its discretion, a new trial is not required unless "substantial rights" of a party are affected. Fed.R.Crim.P. 52(a); *Rye v. Black & Decker Mfg. Co.*, 889 F.2d 100, 103 (6th Cir.1989). Thus, an abuse of discretion that does not affect substantial rights is harmless error and is to be disregarded. Fed.R.Crim.P. 52(a). Specifically, the admissibility of expert testimony "has been traditionally left to the sound discretion of the trial court." *United States v. Green*, 548 F.2d 1261, 1268 (6th Cir.1977). The scope of this discretion has been broadly construed, and the trial court's actions are to be sustained "unless manifestly erroneous." *Id.*

*2. New Standard for Admission of Expert Testimony*

In determining the admissibility of novel scientific evidence, this circuit, like the majority of other circuits, has utilized the *Frye* test, set out in *Frye v. United States*, 293 F. 1013 (D.C.Cir.1923). The court in *Frye* created a "general acceptance" test for the admissibility of testimony about scientific evidence, holding:

> [W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained *general acceptance in the particular field in which it belongs.*

*Id.* at 1014 (emphasis added).[11] We latched onto and tried to define this general acceptance test in a long line of cases. *See, e.g., United States v. Brown*, 557 F.2d 541 (6th Cir.1977).

 The Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, — U.S. —, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), has now rejected *Frye*'s general acceptance test as the exclusive test and has redefined the standard for the admission of expert scientific testimony.[12] The Supreme Court found that the *Frye* test was superseded by Federal Rule of Evidence 702, which makes expert testimony admissible if the scientific or specialized knowledge will assist the trier of fact and if the witness is qualified as an expert. Specifically, that rule states:

> If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise.

II.D.2. As discussed below, general acceptance is no longer *the* test for admissibility of scientific evidence but now is only one factor to consider. Therefore, it is now less compelling to argue that we should take judicial notice of a report by scientists in the field in order to gauge the "general acceptance" of DNA matching by those in the field.

**11.** Several courts have adopted other tests for determining the admissibility of scientific evidence. *See United States v. Williams*, 583 F.2d 1194, 1198 (2d Cir.1978) (admissible if probativeness, materiality, and reliability outweigh its tendency to mislead, prejudice, and confuse the jury), *cert. denied*, 439 U.S. 1117, 99 S.Ct. 1025, 59 L.Ed.2d 77 (1979); *United States v. Jakobetz*, 955 F.2d 786, 794 (2d Cir.) (same), *cert. denied*, — U.S. —, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992); *People v. Castro*, 144 Misc.2d 956, 545 N.Y.S.2d 985 (N.Y.Sup.Ct.1989) (*Frye* test with additional layer for DNA cases); *United States v. Two Bulls*, 918 F.2d 56 (8th Cir.) (adopting *Castro* test), *vacated* (and appeal dismissed after death of appellant), 925 F.2d 1127 (8th Cir. 1991); *People v. Atoigue*, No. CR 91–95A, 1992 WL 245628 (D.Guam.App.Div. Sept. 11, 1992) (applying California's *Kelly–Frye* test).

**12.** We do not set out the facts of *Daubert* because the Supreme Court did not apply this new standard to the facts in that case, but instead remanded the case for a determination of admissibility in light of the new standard.

Fed.R.Evid. 702. The Supreme Court explained that "a rigid 'general acceptance' requirement would be at odds with the 'liberal thrust' of the Federal Rules and their 'general approach of relaxing the traditional barriers to "opinion" testimony.'" *Id.* —— U.S. at ——, 113 S.Ct. at 2794 (quoting *Beech Aircraft Corp. v. Rainey,* 488 U.S. 153, 169, 109 S.Ct. 439, 449, 102 L.Ed.2d 445 (1988)). The Court concluded that the "austere" general acceptance standard, "absent from and incompatible with the Federal Rules of Evidence, should not be applied in federal trials." *Id.*[13]

The Court explained that even under these liberal Federal Rules, the trial judge must ensure that scientific testimony is "not only relevant but reliable." *Id.* —— U.S. at ——, 113 S.Ct. at 2795. The "relevance" requirement stems from Rule 702's requirement that the testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." Thus, there must be a "fit" between the inquiry in the case and the testimony, and expert testimony that does not relate to any issue in the case is not relevant and therefore not helpful. *Id.* The "reliability requirement" is based on Rule 702's requirement that the subject of an expert's testimony be "scientific ... knowledge." *Id.* The Court defined "scientific" as having "a grounding in the methods and procedures of science" and defined "knowledge" as "connot[ing] more than subjective belief or unsupported speculation" and "'apply[ing] to any body of known facts or to any body of ideas inferred from such facts or accepted as truths on good grounds.'" *Id.* (quoting *Webster's Third New International Dictionary* 1252 (1986)). The Court noted that the subject of scientific testimony need not be known to a certainty, but that an inference or assertion must be "derived by the scientific method" and "be supported by

appropriate validation—i.e., 'good grounds,' based on what is known." *Id.* In other words, "scientific knowledge" is that which is known based upon sound reasoning within the framework of the scientific method. In finding that this "scientific knowledge" requirement was a reliability check, the Court indicated that by "reliability" it meant "evidentiary reliability" or "trustworthiness," and that in turn "evidentiary reliability" means "scientific validity." *Id.* —— U.S. at —— n. 9, 113 S.Ct. at 2795 n. 9.

Thus, the trial judge must determine at the outset "whether the expert is proposing to testify to (1) scientific knowledge that (2) will assist the trier of fact to understand or determine a fact in issue." *Id.* at ——, 113 S.Ct. at 2796. "This entails a preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid and of whether the reasoning or methodology properly can be applied to the facts in issue." *Id.*

While the *Daubert* Court did not explicitly define scientific validity or apply its new teaching to the evidence at issue in that case, it did begin to draw the parameters of this inquiry by providing the following non-exclusive list of factors: (1) whether a theory or technique can be (and has been) tested, (2) whether the theory or technique has been subjected to peer review and publication, (3) the known or potential rate of error in using a particular scientific technique and the existence and maintenance of standards controlling the technique's operation, and (4) whether the theory or technique has been generally accepted in the particular scientific field. *See id.* —— U.S. at ——, 113 S.Ct. at 2796–97. The Court emphasized that "the inquiry envisioned by Rule 702 is ... a flexible one. Its overarching subject is the scientific validi-

13. This Circuit in at least one case has addressed the *Daubert* standard. *See Cantrell v. GAF Corp.,* 999 F.2d 1007 (6th Cir.1993). That case involved a challenge to an expert witness's testimony that finding three cases of laryngeal cancer at the plaintiffs' plant indicated an association between the plaintiffs' cancer and the asbestos at the plant. *Id.* at 1012–13. Defendants argued that the testimony did not constitute proper epidemiological evidence because three cases of cancer alone were not probative of the associa-

tion between the asbestos and the plaintiffs' cancer. *Id.* at 1013. The Court affirmed the admission of the testimony, finding that under the new *Daubert* standard, nothing in Rules 702 or 703 or *Daubert* itself prohibited the testimony. *Id.* 999 F.2d at 1014. However, that panel did not confront a general acceptance challenge to scientific testimony, as we do here, and that case was limited to an examination of whether an expert could testify about confirmatory data gained through his own clinical experience. *See Id.*

ty—and thus the evidentiary relevance and reliability—of the principles that underlie a proposed submission. The focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Id.* at ——, 113 S.Ct. at 2797.

Finally, the Court noted that in assessing a proffer of expert scientific testimony under Rule 702, the trial court also must consider other applicable rules, including: (1) Rule 703 (providing that expert opinions based on otherwise inadmissible hearsay are to be admitted only if the facts or data are of a type reasonably relied upon by experts in the field), (2) Rule 706 (allowing the court to call an expert of its own choosing), and (3) Rule 403 (permitting the exclusion of expert evidence if its probative value is substantially outweighed by the danger of unfair prejudice). *Id.* —— U.S. at ——, 113 S.Ct. at 2797–98.

■ We believe that by defining evidentiary reliability in terms of scientific validity, by couching almost the entire discussion of admissibility of scientific evidence in terms of scientific validity, and by requiring that the inquiry be focused solely on the methodology and principles underlying the proffered scientific expert testimony, the *Daubert* Court has instructed the courts that they are not to be concerned with the reliability of the conclusions generated by valid methods, principles and reasoning. Rather, they are only to determine whether the principles and methodology underlying the testimony itself are valid. If the principles, methodology and reasoning are scientifically valid then it follows that the inferences, assertions and conclusions derived therefrom are scientifically valid as well. Such reliable evidence is admissible under Rule 702, so long as it is relevant.

### E. Applying Rule 702 to the Expert Testimony in this Case

#### 1. Rulings of the Magistrate Judge and the District Court

■ We note that although the findings of the magistrate judge and the district court were based only on the pre-*Daubert Frye* hearing and the general acceptance test, these findings are relevant to our examination under a *Daubert* analysis, first because, as the district court noted, neither the defendants nor the Government challenge the magistrate judge's findings regarding the substance of the expert testimony presented at the *Frye* hearing or his characterization of the testimony, and second, because general acceptance is still one factor the Supreme Court has said can impact on a court's scientific validity determination and the defendants' arguments on appeal focus on these findings and their general acceptance determination. After a thorough review of the record, we hold that these findings are not clearly erroneous, and we adopt the magistrate's findings as conclusive, *see Anderson v. City of Bessemer City,* 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511–12, 84 L.Ed.2d 518 (1985). We briefly summarize those findings below.

The magistrate judge issued exhaustive findings on the DNA evidence. He began with a discussion of DNA technology and the procedures used in the FBI's DNA lab to come up with matches, he proceeded through a very thorough overview of the experts' testimony at the *Frye* hearing, and he discussed the *Frye* standard in this Circuit and the general acceptance test, concluding that the Government must show that the principles and procedures used in formulating the DNA evidence are generally accepted or that they are in conformity with generally accepted explanatory theories. The magistrate found that the pertinent scientific community was molecular biologists and population geneticists, that the burden of proof to meet general acceptance is a preponderance of the evidence, and that the judge's role is limited to determining whether the procedures and principles are generally accepted and does not extend to determining the reliability or validity of the results. The magistrate then defined general acceptance by stating what general acceptance is not—it does not require unanimity or consensus, or certainty, or approval by other courts. He cited factors to consider in determining general acceptance and noted that this Circuit has found the absence of general acceptance only where the evidence "has been manifestly unsupported outside the proponent's own labo-

ratory." Relying on the government witnesses' stature, Dr. Caskey's [14] acceptance of the protocol, the other witnesses' belief that the protocol is generally accepted, other labs' acceptance of the protocol, and the more persuasive testimony of the Government's experts, the magistrate concluded that disputes over the reliability of results went only to the weight of the evidence and that the Government had met its burden of showing that the FBI's protocol and procedures were accepted by "the general scientific community."

The magistrate went on to make alternative findings on the merits of the disputes about the reliability of the results, in the event that a reviewing court disagreed with him that reliability disputes go to weight, not admissibility. He found that the FBI was able to produce reliable results, despite some flaws in the protocol relating to such matters as quasi-continuous allele systems, validation studies, environmental insult studies, proficiency testing, and ethidium bromide use. Notably, he concluded that the prospect of ethnic substructure did not impact on the reliability of results, but went to the weight of the evidence. Finally, the magistrate concluded that he could not make a Rule 403 ruling because this was a fact-specific inquiry for the trial court.

The defendants objected to the R & R on three grounds: (1) that the magistrate's definition of "general acceptance" was flawed and his finding that a consensus is not needed was erroneous; (2) that the magistrate's findings on reliability were flawed; and (3) that the magistrate failed to consider the Rule 403 argument. The district court, in an opinion that thoroughly reviewed the magistrate's report, found no merit in defendants' objections and adopted the report and recommendation.

■ Although the magistrate judge and the district court in admitting the DNA testimony focused on the general acceptance test that has now been superceded by the Supreme Court's recent *Daubert* decision, we still may affirm the district court on other grounds. *See Foster v. Kassulke,* 898 F.2d

1144, 1146 (6th Cir.1990) (a decision by a district court must be affirmed " 'if correct for any reason, including a reason not considered by the lower court' " (quoting *Russ' Kwik Car Wash Inc. v. Marathon Petroleum Co.,* 772 F.2d 214, 216 (6th Cir.1985) (per curiam))). We need not ask the parties to rebrief the issues or remand this case to the district court for reconsideration since we have a complete record before us, and, as we shall demonstrate hereinafter, it is clear from this record that the DNA evidence and testimony would have met the more liberal Rule 702 test adopted by the Supreme Court.

*2.* Daubert's *Prongs*

*a. Relevance requirement*

■ We hold that the expert testimony meets the "relevance" prong of the admissibility test: that the evidence or testimony "assist the trier of fact to understand the evidence or to determine a fact in issue." This requirement merely looks at whether the evidence and testimony is relevant to any issue in the case. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2795. The testimony must be " 'sufficiently tied to the facts of the case that it will aid the jury in resolving a factual dispute.' " *Id.* at ——, 113 S.Ct. at 2796 (quoting *United States v. Downing,* 753 F.2d 1224, 1242 (3d Cir.1985)). The evidence that Bonds's DNA matched at least to some extent the DNA found in the crime-scene sample clearly is relevant to whether defendant Bonds was present in the victim's van on the night of the murder. Thus, the DNA evidence was helpful to the jury in determining whether defendants were guilty of the charges.

*b. Evidentiary reliability requirement*

■ *Daubert* requires that a preliminary assessment of the proffered testimony be made to determine whether the principles, methodology and reasoning underlying the testimony are scientifically valid. It is important to note that what is being challenged here by the defendants is not the general

---

**14.** Dr. Caskey, a government witness, is a forensic DNA scientist who employs the FBI's procedures for VNTR identification and matching in his laboratory, one of the country's major genetics laboratories.

principle that individuals can be identified by their DNA, the principle that there are tests that can be performed to make these identifications, or the methodology of performing comparative testing by analyzing size and length variations among VNTR alleles in blood samples and calculating the statistical probabilities of a "match." In fact, the defendants presented considerable evidence at the *Frye* hearing about how these tests should have been performed. What the defendants challenge is the particular application of that methodology by the FBI in performing those tests and the results reached by the FBI. Their challenge is essentially that had the tests been performed differently, using a different database for the calculation of the statistical probabilities of the match, and using different materials in performing the test or using a different multiplication rule, the results would have been more accurate and perhaps different. Defendants also challenge the way the methodology was tested, arguing that the reliability of the results would have been greater had a different method of testing been employed. Defendants do not challenge the fact that the specific application of the methodology used by the FBI generated *some probability* that the DNA sample that "matched" Bonds's sample in fact came from Bonds; they only challenge the precision of that probability estimate. *Daubert* requires only scientific validity for admissibility, not scientific precision.

■ With this in mind, we now turn to the four factors that the Supreme Court observed would bear on a determination of whether the testimony pertains to scientific knowledge that will assist the trier of fact: (1) whether a theory or technique can be or has been tested; (2) whether the theory or technique has been subjected to peer review and publication; (3) the known or potential rate of error in using a particular scientific technique and the standards controlling the technique's operation; and (4) whether the theory or technique has been generally accepted in the particular scientific field.[15] We

note that the first two—can it be or has it been tested? and has it been peer reviewed?—are integral to the former general acceptance analysis and the magistrate judge made specific findings regarding them. The third factor—the known or potential rate of error and the existence and maintenance of standards controlling the technique's operation—is also encompassed in the peer review and testing factors and is implicit in the magistrate's general acceptance findings. The fourth factor is, of course, general acceptance, and the magistrate made explicit findings as to this. Thus, we can look to the magistrate's findings in making our determination.

### i. Testing of theory or technique

■ The *Daubert* Court found that a "key question" is whether the theory or technique can be and has been tested. *Daubert,* —— U.S. at ——, 113 S.Ct. at 2796. Evidence credited by the district court establishes that the theory behind matching DNA and calculating probabilities, and the particular technique employed by the FBI lab, can in fact be tested by comparing the results generated from one set of samples with the results reached after repeating the matching and probability estimate process on control samples. It is irrelevant that there are other methods for DNA matching that could also be or have been tested.

Furthermore, the FBI's principles and methodology have in fact been tested. The FBI performed internal proficiency testing as well as validation studies and environmental insult studies to determine whether the lab could produce reliable, reproducible results from samples that had been mixed with contaminants or subjected to environmental insults such as sun. In his report and recommendation, the magistrate made alternative findings on reliability and found that the FBI could reliably determine a match. Specifically, the magistrate addressed the criticisms raised about the FBI's validation studies, finding that the defects in the validation studies "did not affect [the FBI's] ability

---

**15.** The *Daubert* Court in setting out these factors spoke in terms of "theory" and "technique," and we adopt their language for this analysis.

reliably to make accurate determinations of matches and avoid false positives." The magistrate also addressed the criticisms of the FBI's mixed body fluid and environmental insult studies, and of the "Repeat Caucasian Database," and concluded that these too did not present a significant risk of false matches. The magistrate considered as well the FBI's failure to implement a "comprehensive" or "meaningful" program of effective proficiency testing, and found that the FBI did have a proficiency testing program—although one with serious deficiencies—and that this dispute was merely a dispute over technique. Therefore, it is clear that the FBI's theories, principles, methods, and techniques can be tested and have in fact been tested.

Finally, it seems clear that this first *Daubert* factor is not really in dispute. The *Daubert* Court found that " 'the criterion of the scientific status of a theory is its ... refutability.' " *Id.* at ——, 113 S.Ct. at 2797 (quoting K. Popper, *Conjectures and Refutations: The Growth of Scientific Knowledge* 37 (5th ed. 1989)). Defendants vociferously dispute the accuracy of the match results and the adequacy of the testing done, and in refutation have presented evidence about deficiencies in both the results and the testing of the results. Thus, it appears that by attempting to refute the FBI's theory and methods with evidence about deficiencies in both the results and the testing of the results, the defendants have conceded that the theory and methods can be tested. The dispute between the Government and the defendants is over *how* the results have been tested, not over *whether* the results can be or have been tested.

#### ii. Peer review

The Supreme Court has observed that peer review and publication is another consideration in determining whether scientific evidence is admissible under Rule 702. The Court noted that publication—just one element of peer review—is not essential for admissibility or synonymous with reliability.

> [I]n some instances well-grounded but innovative theories will not have been published. Some propositions, moreover, are too particular, too new, or of too limited interest to be published. But submission to the scrutiny of the scientific community is a component of "good science," in part because it increases the likelihood that substantive flaws in methodology will be detected. The fact of publication (or lack thereof) in a peer-reviewed journal thus will be a relevant, though not dispositive, consideration in assessing the scientific validity of a particular technique or methodology on which an opinion is premised.

*Id.* (citations omitted).

■ The key here is that the theory and procedures have been submitted to the scrutiny of the scientific community, in part to "increase[ ] the likelihood that substantive flaws in methodology will be detected." *Id.* It is important, however, to note that "flaws in methodology" uncovered by peer review do not necessarily equate to a lack of scientific validity, since the methods may be based on scientific principles and the alleged flaws go merely to the weight, not the admissibility, of the evidence and the testimony. Instead, peer review and publication should be viewed as evidence that the theory and methodology are scientific knowledge capable of being scrutinized and have in fact been scrutinized by the scientific community.

■ Here, the FBI's procedures certainly have received "at least some exposure within the scientific peerage to which [they] belong[ ]." *United States v. Kozminski*, 821 F.2d 1186, 1201 (6th Cir.1987) (en banc), *aff'd*, 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988). In fact, at the *Frye* hearing, the Government introduced articles on the FBI's techniques, including the FBI's statistical estimates.[16] *See* Government's

---

16. The Government's witnesses acknowledged that many of the articles introduced as Government exhibits did not appear in a "peer-reviewed journal" in the strict sense of that term. Technically, a peer review scientific journal is one in which a scientist submits a manuscript that is reviewed by outside experts selected by that journal and the experts criticize the article and send the author their comments. Only after peer review is satisfied is the article accepted for publication. Nonetheless, all of the articles gave the

Exhibit $ 9 (Bruce Budowle, "Applying Highly Polymorphic VNTR Loci Genetic Markers to Identity Testing," *Clinical Biochemistry* (peer-reviewed article on probes)); Government's Exhibit $ 11 (a peer-reviewed article on computer-assisted interpretation); Government's Exhibit $ 13 (Bruce Budowle et al., *Fixed Bin Analysis for Statistical Evaluation of Continuous Distribution of Allelic Data From VNTR Loci for Use in Forensic Comparisons*); Government's Exhibit $ 14 (B. Budowle & K. Monson, *A Statistical Approach for VNTR Analysis* ); Government's Exhibit $ 15 (*Crime Laboratory Digest* article, vol. 15, no. 4 (October 1988) (article in journal on FBI's research and procedures)). And the theory behind "matching" DNA itself and the general procedures used to come up with the forensic results clearly have received peer evaluation. In addition, the magistrate in this case anticipated *Daubert* by concluding that expert testimony from experts outside the proponents' lab and acceptance of the proponent's writings in professional journals—in essence peer evaluation or review—were factors to consider in determining general acceptance and thus admissibility.[17] The magistrate concluded that the FBI's methods had received ample acceptance outside the FBI lab.

### iii. Rate of error

The *Daubert* Court also observed that the trial court "ordinarily should consider the known or potential rate of error" and "the existence and maintenance of standards controlling the technique's operation." *Daubert*, — U.S. at ——, 113 S.Ct. at 2797. The FBI did conduct *internal* proficiency tests to determine a rate of error and calculated a rate of error, although the magistrate found these proficiency tests to have "serious deficiencies." Defendants argued at the *Frye* hearing and on appeal that the scientific community considers indispensable *external blind*

proficiency tests to account for laboratory error.

▮ The deficiencies in calculating the rate of error and the failure to conduct external blind proficiency tests are troubling. We find troubling as well the lack of specific references to the rate of error in the Joint Appendix provided to this Court by the parties. Although we find that on the basis of the record before us the rate of error is a negative factor in the analysis of whether the FBI's procedures are scientifically valid, the error rate is only one in a list of nonexclusive factors that the *Daubert* Court observed would bear on the admissibility question. In addition, as noted in the next subsection, we find that the district court did not err in finding that the FBI's principles and procedures for declaring matches and calculating probabilities are generally accepted by the scientific community; because the magistrate judge's findings underlying general acceptance encompass the "existence and maintenance of standards controlling the technique's operations," *id.*, it is implicit that the rate of error is acceptable to the scientific community as well.

### iv. General acceptance

Finally, the *Daubert* Court indicated that the scientific validity analysis "does not require, although it does permit," us to consider the degree to which the FBI's principles and methodology are generally accepted in the relevant scientific community. *Daubert* noted that "[w]idespread acceptance can be an important factor in ruling particular evidence admissible, and 'a known technique that has been able to attract only minimal support within the community' may properly be viewed with skepticism." *Id.* (quoting *Downing*, 753 F.2d at 1238).

The concept of examining the "general acceptance" of a particular scientific theory and procedure stems from *Frye v. United States*,

FBI's procedures exposure within the scientific community.

17. We note that factor number one—can it be and has it been tested?—goes hand in hand with factor number two—peer review. If a court finds that a scientific principle or procedure has been peer-reviewed, then in most instances that

principle or procedure can be, and has been, tested. It is virtually impossible to have peer review of a principle or theory that cannot be tested because peer review almost always consists of a review of the scientific validity and accuracy of that particular principle or procedure.

293 F. 1013 (D.C.Cir.1923), where the D.C. Circuit held:

> [W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, *the thing from which the deduction is made* must be sufficiently established to have gained *general acceptance in the particular field in which it belongs.*

*Id.* at 1014 (emphasis added). Before *Daubert,* the *Frye* general acceptance test was the exclusive test in this and several other circuits for determining whether testimony about scientific evidence was admissible. Post–*Daubert,* general acceptance is but one of at least four factors that we may consider in determining whether testimony is admissible under Rule 702. Since the defendants argue extensively that the DNA testimony was not based on generally accepted procedures, since this was the focus of both the magistrate's *Frye* hearing and the district court's ruling, and since the *Frye* test utilizes to some extent at least two of the *Daubert* factors, we address general acceptance in some detail.

### (a) Elements of general acceptance

Under our pre-*Daubert* case law,[18] general acceptance exists when a substantial portion of the pertinent scientific community accepts the theory, principles, and methodology underlying scientific testimony because they are grounded in valid scientific principles. *See Sterling v. Velsicol Chemical Corp.,* 855 F.2d 1188, 1207 (6th Cir.1988) ("few have endorsed either its scientific methodology or the results of any experiments conducted under the guise of clinical ecology"); *Novak v. United States,* 865 F.2d 718, 725 (6th Cir.1989) (theories were neither "widely accepted" nor "generally accepted" in the medical community). The cases discuss general acceptance in terms of "reliability" but refer only to the reliability of the procedures and process, not the reliability of the results of the procedures. As this Court stated in *United States v. Brown,* 557 F.2d 541 (6th Cir.1977):

> [W]e equated general acceptance in the scientific community with a showing that the scientific principles and procedures on which expert testimony is based are reliable and sufficiently accurate. However, "[a]bsolute certainty of result or unanimity of scientific opinion is not required for admissibility."

*Id.* at 556 (quoting *United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975)). *See also United States v. Kozminski,* 821 F.2d 1186, 1200 (6th Cir.1987) (Krupansky, J., concurring) ("[A]bsolute certainty of result or unanimity of scientific opinion is not required for admissibility so long as the conclusions drawn by the experts are based on generally accepted and *reliable* scientific principles." (emphasis added)), *aff'd,* 487 U.S. 931, 108 S.Ct. 2751, 101 L.Ed.2d 788 (1988); *United States v. Franks,* 511 F.2d 25, 33 n. 12 (6th Cir.), *cert. denied,* 422 U.S. 1042, 95 S.Ct. 2654, 45 L.Ed.2d 693 (1975) (general acceptance "nearly synonymous with reliability"). Disputes about specific techniques used or the accuracy of the results generated go to the weight, not the admissibility of the scientific evidence. This Court in *United States v. Stifel,* 433 F.2d 431 (6th Cir.1970), *cert. denied,* 401 U.S. 994, 91 S.Ct. 1232, 28 L.Ed.2d 531 (1971), explained:

> The decision as to whether the state of the technology in this field was such as to render testimony based on neutron activation analysis admissible was, of course, a decision for the Judge. Any disputes about the technique employed by the Government's expert or the results of his test went to the quality of the evidence and were for consideration by the jury.

*Id.* 433 F.2d at 438. The *Stifel* Court also noted that absolute certainty is not necessary for a finding of general acceptance:

> [N]either newness nor lack of absolute certainty in a test suffices to render it inadmissible in court. Every useful new development must have its first day in court. And court records are full of the conflicting opinions of doctors, engineers and ac-

---

18. Because general acceptance is only one of four factors we must examine under the new standard, we touch only briefly on the prior case law dealing with general acceptance.

countants, to name just a few of the legions of expert witnesses.

*Id.* In examining "general acceptance" and in addressing the parties' arguments, we are confronted in this case with the question of what exactly must be generally accepted: whether only the theory of DNA profiling needs to be generally accepted or whether the FBI's methodology for conducting DNA testing need also to be generally accepted. The cases out of this circuit have not been entirely consistent in addressing what needs to be generally accepted.

We find that general acceptance encompasses both. *See Brown,* 557 F.2d at 556 (" '[T]here must be a *demonstrable, objective procedure* for reaching the opinion and qualified persons who can either duplicate the result or criticize the means by which it was reached.' " (emphasis added) (quoting *United States v. Baller,* 519 F.2d 463, 466 (4th Cir.), *cert. denied,* 423 U.S. 1019, 96 S.Ct. 456, 46 L.Ed.2d 391 (1975))). This view is consistent with *Daubert*'s requirement that we determine whether the "reasoning or methodology underlying the testimony is scientifically valid," *Daubert,* — U.S. at —, 113 S.Ct. at 2796, and its acknowledgement that a "known technique that has been able to attract only minimal support in the scientific community may properly be viewed with skepticism," *id.*

■ Having defined *what* must be generally accepted, we now must review the defendants' arguments that the magistrate judge and the district court erred in defining general acceptance. The magistrate concluded that general acceptance does not require that there be "unanimity, or consensus within the scientific community concerning such acceptability." He noted, however, that although "neither consensus nor certainty" is needed, an absence of consensus is not immaterial. The district court concurred in the magistrate judge's conclusion. The defendants strenuously object, arguing that a consensus is necessary and that the FBI's procedure is not supported by such a consensus.

A careful review of the case law in this circuit persuades us that the "consensus" question is a red herring. "Consensus" is simply not a term that has been used in this

circuit to determine whether the Frye general acceptance test has been met. Rather, our precedent demonstrates that while ordinarily the principles and procedures must be accepted by a majority of those in the pertinent scientific community, the absence of a majority does not necessarily rule out general acceptance. The general acceptance test is designed only to uncover whether there is a general agreement of scientists in the field that this scientific data is not based on a novel theory or procedure that is "mere speculation or conjecture." *Brown,* 557 F.2d at 559. In some instances, there may be several different theories or procedures used concerning one type of scientific evidence, all of which are generally accepted. None may have the backing of the majority of scientists, yet the theory or procedure can still be generally accepted. And even substantial criticism as to one theory or procedure will not be enough to find that the theory/procedure is not generally accepted. Only when a theory or procedure does not have the acceptance of most of the pertinent scientific community, and in fact a substantial part of the scientific community disfavors the principle or procedure, will it not be generally accepted. *See, e.g., Novak v. United States,* 865 F.2d 718, 725 (6th Cir.1989) (theories were neither "widely accepted" or "generally accepted" in the medical community).

Accordingly, we find that the magistrate judge's definition of consensus and his holding in regard to consensus thus defined are immaterial to the resolution of this issue. What is material is that the magistrate judge's findings clearly indicate that the degree of acceptance in the scientific community of the theory of DNA profiling and of the basic procedures used by the lab in this case is sufficient to meet the requirements in this circuit for general acceptance. The Government's experts, some of whom were from outside the FBI lab, clearly indicated that the FBI's DNA procedures were generally accepted. Despite their rebuttal criticism, the defendants' experts did not in fact show that the procedures were not generally accepted; they only showed a substantial controversy over whether the results produced were reliable and accurate.

Defendants argue that the magistrate judge erred in stating that questions about the reliability of the results are not relevant to the general acceptance determination but are only factors for the jury to weigh in considering the evidence at trial. We hold that questions about the accuracy of results are matters of weight, not admissibility.

■■■■ The decision whether to admit the expert testimony in the first place is a matter of law for the trial judge. *Stifel*, 433 F.2d at 438. Once a court admits the testimony, "then it is for the jury to decide whether any, and if any what, weight is to be given to the testimony." *Id.* In the context of scientific evidence, this means that "conflicting testimony concerning the conclusions drawn by experts, so long as they are based on a generally accepted and reliable scientific principle, ordinarily go to the weight of the testimony rather than its admissibility." *Brown*, 557 F.2d at 556. The *Daubert* Court made it explicit that in determining the scientific validity and thus the "evidentiary reliability" of scientific evidence, "[t]he focus, of course, must be solely on principles and methodology, not on the conclusions that they generate." *Daubert*, — U.S. at —, 113 S.Ct. at 2797. Questions about the certainty of the scientific results are matters of weight for the jury. For example, in discussing the fact that a hair sampling technique only showed similarities between the hairs and could not show a match with certainty, "[t]he lack of certainty went to the weight to be assigned to the testimony of the expert, not its admissibility, and defense counsel did a creditable job of arguing to the jury that it should be assigned little weight." *United States v. Brady*, 595 F.2d 359, 363 (6th Cir. 1979). And, in general, criticisms touching on whether the lab made mistakes in arriving at its results are for the jury. As the Court in *United States v. Jakobetz*, 955 F.2d 786 (2d Cir.), *cert. denied*, — U.S. —, 113 S.Ct. 104, 121 L.Ed.2d 63 (1992), stated:

> The district court should focus on whether accepted protocol was adequately followed in a specific case, but the court, in exercising its discretion, should be mindful that this issue should go more to the weight than to the admissibility of the evidence.

Rarely should such a factual determination be excluded from jury consideration. With adequate cautionary instructions from the trial judge, vigorous cross-examination of the government's experts, and challenging testimony from defense experts, the jury should be allowed to make its own factual determination as to whether the evidence is reliable.

*Id.* at 800 (discussing *Williams* standard but noting it would meet *Frye* as well).

Accordingly, we hold that general acceptance is required as to the principles and methodology employed. The assessment of the validity and reliability of the conclusions drawn by the expert is a jury question; the judge may only examine whether the principles and methodology are scientifically valid and generally accepted.

■■■ Thus in this case, the criticisms about the specific application of the procedure used or questions about the accuracy of the test results do not render the scientific theory and methodology invalid or destroy their general acceptance. These questions go to the weight of the evidence, not the admissibility.

With this in mind, we turn to address the defendants' arguments that the FBI's DNA procedures are not generally accepted by population geneticists and molecular biologists.

### (b) Defendants' contentions

Defendants make several arguments to support their contention that the FBI's procedures for making statistical probability estimates are not generally accepted by population geneticists. These arguments focus on the FBI's methods of computing the 1 in 35,000 probability that a caucasian person other than defendant Bonds would have the same DNA pattern that Bonds has.

Defendants first argue that the magistrate's projections that the FBI's statistical method would be generally accepted turned out to be wrong because the NRC Report later showed the FBI's statistical basis to be invalid. Because, as we noted above, we cannot consider the NRC Report, this argument is irrelevant and we do not consider it.

However, the particular complaints that defendants have as to erroneous projections by the magistrate judge are addressed below in the context of their objections to the magistrate judge's overall general acceptance finding.

■ Defendants next argue that ·general acceptance was not established because the FBI's methods were not published in peer-reviewed journals. As ·the *Daubert* Court noted, publication is but one element of peer review, is not a *sine qua non* of admissibility, *Daubert*, —— U.S. at ——, 113 S.Ct. at 2797, and is not prerequisite to a finding of scientific validity. As noted above in our discussion of the second *Daubert* factor, we believe that the FBI's procedures have received some peer review. Any shortcomings in the peer review of the FBI's procedures are not sufficient to overcome the other strong evidence that the FBI's principles and procedures were both generally accepted and scientifically valid.

■ Defendants' strongest criticism of the FBI's procedures for declaring DNA matches and estimating probabilities is that the database used by the FBI to make a probability estimate· of the DNA pattern found in Bonds's blood failed to take into account ethnic substructure. Defendants' argument is based on the fact that the blood samples of the 225 FBI agents which make up the database used in this case were not divided into ethnic· subgroups within the caucasian group, such as Polish and Italian. Defendants' experts testified that without accounting for ethnic substructure, the statistics indicating the frequencies with which certain DNA alleles appear ·in each racial group are exaggerated when the individual allele frequencies are multiplied together using the product or multiplication rule.[19] According to these experts, the FBI should have used ·a more conservative method of estimating the frequencies of the alleles to take into account the possibility of ethnic substructure.

This substructure argument involves a dispute over the accuracy .of · the probability results, and thus this criticism goes to the weight of the evidence, not its admissibility. *See, e.g., Commonwealth v. Gomes*, 403 Mass. 258, 526 N.E.2d 1270 (1988) (ethnic substructure argument goes to weight); *Jakobetz*, 955 F.2d at 799 (ethnic substructure prospect would not justify exclusion under *Frye* test). *But see, e.g.,* ·*United States v. Porter*, 618 A.2d 629 (D.C.1992) (ethnic substructure affects crucial probability estimate and thus is not a weight question); *People v. Barney*, 8 Cal.App.4th 798, 10 Cal.Rptr.2d 731 (Cal.Ct. App.1992) (controversy over ethnic substructure forecloses general acceptance under *Kelly–Frye* test); *Commonwealth v. Lanigan*, 413 Mass. 154, 596 N.E.2d 311 (1992) (no general acceptance under more stringent test because of dispute over population sub-structure). Defendants' experts indicated that the FBI's methods were flawed because they did not take ·into account ethnic substructure.· However, the Government's witnesses indicated that the results were not distorted by the possibility of ethnic substructure because the Government's methods of estimating frequencies were still conservative. Significantly, the defense witnesses could only speculate about the effect of ethnic substructure because there is no positive evidence that ethnic substructure in fact exists.

The district court correctly found that it could not examine this dispute going to the accuracy of the results, but could only examine whether the testimony was based on generally accepted (and scientifically valid) theories and procedures. The evidence and testimony presented at this *Frye* hearing demonstrate that the DNA evidence was not based on untested or unacceptable theories or procedures. Because the DNA results were based on scientifically valid principles and· derived from scientifically valid procedures, it is not dispositive that there are scientists who vigorously argue that ·the probability estimates are not accurate or reliable because of the possibility of ethnic substructure. The potential of ethnic substructure

---

**19.** The complaint is, of course, that this results in a decreased probability that someone other than·

defendant Bonds was the source of the sample.

does not mean that the theory and procedures used by the FBI are not generally accepted; it means only that· there is a dispute over whether the results are as accurate as they might be and what, if any, weight the jury should give those results. ·

Besides their contention that the FBI's statistical procedures are not generally accepted among population geneticists, defendants also argue that the FBI's methods for declaring matches and interpreting autorads are not generally accepted among molecular biologists. Defendants allege a number of flaws in these methods · including that the FBI's environmental insult studies and match criterion were flawed, that the FBI used ethidium bromide in analytic gels, and that the FBI was unable to type the same DNA samples reliably and reproducibly in its repeat ·caucasian database.

We addressed some· of these concerns in discussing *Daubert* factors number one (can it be tested?) and number three (what is the known or potential rate of error?). We reiterate here that the magistrate and the district court did not err in finding that these flaws in the methods for declaring matching and interpreting autorads were issues of weight and did not pose the risk that the results were based on unaccepted principles or procedures.

Thus, we find that *Daubert* factor number· four argues in favor of admissibility because the principles and procedures on which the DNA testimony was based are generally accepted by the relevant scientific communities.[20]

### (c) Conclusion as to Daubert prongs

When reviewed in light of the four *Daubert* factors (testing, peer review, rate of error, and general acceptance), we find that the underlying principles and methodology used by the FBI to declare matches and make statistical probabilities are scientifically valid. The methodology was valid in that it "result[ed] from sound and cogent reasoning," Bert Black, *A Unified Theory of Scientific Evidence*, 56 Ford.L.Rev. 595, 599 (1988), and was "'well grounded or justifiable [and] applicable to the matter at hand,'" *id.* at 599 n. 9 (quoting *Webster's Unabridged* 2529–30). Thus, the methodology clearly had "a grounding in the methods and procedures of science" and was based on "more than subjective ·belief or unsupported speculation." *Daubert*, —— U.S. at ——, 113 S.Ct. at 2795.

■ *Daubert* sets out a "flexible" and more lenient test that favors the admission of any scientifically valid expert· testimony. "Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* The Court added that if the trial court concludes that the scintilla of evidence supporting a position is insufficient to allow a reasonable juror to conclude that the position is more likely than not true, the court can direct a judgment or grant summary judgment. *Id.* "These conventional devices, rather than wholesale exclusion under an uncompromising 'general acceptance' test, are the appropriate safeguards where the basis of scientific testimony meets the standards of Rule 702." *Id.* Thus, ·it is irrelevant that the FBI's DNA matching and statistical techniques are still being refined or that the results produced may not be wholly accurate since, as the Supreme Court noted, "it would be unreasonable to conclude that the subject of scientific testimony must be 'known' to a certainty; arguably, there are no certainties in science." *Id.* at ——, 113 S.Ct. at 2795. The results of the DNA testing were clearly derived from tests based on methods and procedures of

---

**20.** We have not focused on cases from other jurisdictions that address the admissibility of DNA evidence because most courts examining whether scientific evidence is generally accepted have refused to focus on judicial approval of a technique since acceptance "is that of scientists, not courts." *People v. Reilly*, 196 Cal.App.3d 1127, 242 Cal.Rptr. 496, 500 (1987). However, this court in *Stifel*, 433 F.2d at 438, *Franks*, 511 F.2d at 33 n. 12, and *United States v. Distler*, 671 F.2d 954, 962 (6th Cir.), *cert. denied*, 454 U.S. 827, 102 S.Ct. 118, 70 L.Ed.2d 102 (1981), noted acceptance by other courts. Thus, we note in passing that the majority of the courts have admitted ·DNA testimony and evidence as being generally accepted. *See, e.g., Bethune v. State*, 828 S.W.2d 14 (Tex.Crim.App.1992); *Hawaii v. Montalbo*, 73 Haw. 130, 828 P.2d 1274 (1992); *Davidson v. State*, 580 N.E.2d 238 (Ind.1991).

science and not based merely on speculation, and were supported by sound and cogent reasoning, even if these methods and procedures are not perfected.

*Daubert* requires only that the evidence be scientifically valid to have evidentiary reliability. We have found that the underlying methodology and reasoning are scientifically valid, and it is undisputed that the general principle that individuals can be identified by DNA is scientifically valid. Therefore, we need not examine that issue further. Having found as well that the evidence meets the relevance requirement of being "helpful to the trier of fact," we hold that the testimony proffered by the Government about the DNA matching and probabilities easily met the *Daubert* standard and was admissible under Rule 702.[21]

### F. Other applicable rules

The *Daubert* Court stated that, throughout this analysis of the admission of scientific data, a judge assessing a proffer of expert scientific testimony under Rule 702 "should also be mindful of other applicable rules," such as Federal Rules of Evidence 703, 706, and 403. Thus, we must review the admission of the DNA testimony in light of these rules as well.

#### 1. Rule 703

Defendants argue that the FBI's method for calculating the probability of a coincidental match of Bond's DNA should have been excluded under Fed.R.Evid. 703[22] because it was not based on the type of data reasonably relied upon by experts in the field. Ordinarily, we would find defendants had waived this

Rule 703 argument for appeal because they failed to raise it in the district court in their objections to the R & R or in the *Frye* hearing. *See United States v. Ushery*, 968 F.2d 575, 582 n. 2 (6th Cir.) (failure to raise issue in district court is waiver), *cert. denied*, —— U.S. ——, 113 S.Ct. 392, 121 L.Ed.2d 301 (1992). However, because the *Daubert* Court requires that trial judges be mindful of this rule in admitting scientific evidence, we address this rule as well in reviewing the admission of the testimony.

The trial court is to use "[g]reat liberality" in determining the basis of an expert's opinions, and the trial court may not decide whether the opinion itself should be accepted. *Mannino v. International Mfg. Co.*, 650 F.2d 846, 852 (6th Cir.1981). Rule 703 permits experts to testify without personal knowledge of the underlying facts or data and permits them to testify on the basis of hearsay or unadmitted evidence, as long as the evidence is of a kind "reasonably relied upon by experts in the particular field." *Coal Resources Inc. v. Gulf & W. Indus., Inc.*, 954 F.2d 1263, 1272 (6th Cir.1992). The rule has been interpreted as merely requiring that experts' scientific knowledge be based on sound methodology. *Ambrosini v. Labarraque*, 966 F.2d 1464 (D.C.Cir.1992).

We find that the Government experts' testimony was based on data and facts reasonably relied upon by experts in molecular biology and population genetics. Our finding that the FBI's theory and procedures are "scientifically valid" under Rule 702 indicates that the experts' testified about scientific knowledge that was based on "sound methodology." In addition, in finding that the principles and procedures have been "generally

**21.** We note that because we have found that the FBI's DNA principles and procedures are generally accepted by scientists in the field, the FBI's principles and procedures have met the standard the Supreme Court has labelled as "rigid," "at odds with the 'liberal thrust' of the Federal Rules," "austere," and "uncompromising." *Daubert,* —— U.S. at ——, ——, 113 S.Ct. at 2794, 2798. Accordingly, it is difficult to see how the FBI's theory and procedures would not pass muster under the more "liberal" Rule 702 analysis set out in *Daubert*. If under the "rigid" general acceptance standard we would have affirmed the admissibility of the DNA testimony and evidence, we certainly have little problem

upholding the admission under this more lenient "scientific validity" test.

**22.** Federal Rule of Evidence 703 [Bases of Opinion Testimony by Experts] states:

The facts or data in a particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing. If of a type *reasonably relied upon by experts in the particular field* in forming opinions or inferences upon the subject, the facts or data need not be admissible in evidence.
(emphasis added.)

accepted" in the pertinent scientific communities, we cannot help but find that the evidence is "of a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject." Fed.R.Evid. 703.

### 2. Rule 706

 Federal Rule of Evidence 706 permits the court on its own to appoint an expert witness.[23] Here, the magistrate appointed Dr. Eric Lander as its expert witness. In its R & R, the magistrate recognized the "pre-eminent status" of Dr. Lander, took into account his reservations about the FBI's procedures, but concluded that other experts' assessments were "more likely to reflect an accurate understanding of the view of the scientific community than that of Dr. Lander [alone]." Thus, the magistrate relied on the testimony of Dr. Lander as well as that of the parties' experts to conclude that the DNA testimony was admissible. The court's appointment of its own expert witness counsels in favor of affirming the admission of the DNA testimony.

### 3. Rule 403 Challenge

 In addition to the mandate from *Daubert* that we consider the admission of scientific testimony in light of Rule 403, defendants at trial and in their brief also made an argument that the Government's expert testimony did not meet Rule 403,[24] which requires that the probative value of the scientific expert testimony not be substantially outweighed by any unfair and prejudicial effect of the testimony.[25] We find that the

district court did not err in finding that the prejudice from the testimony about the DNA evidence did not substantially outweigh its probative value.

 The district court's Rule 403 balancing is an evidentiary ruling that we may review only for an abuse of discretion. *Doe v. Sullivan County, Tenn.*, 956 F.2d 545, 559 (6th Cir.), *cert. denied*, —— U.S. ——, 113 S.Ct. 187, 121 L.Ed.2d 131 (1992). District courts are given broad discretion in making a Rule 403 determination. *United States v. Vincent*, 681 F.2d 462, 465 (6th Cir.1982). Our review of a Rule 403 ruling is limited in that we must look at the evidence in "the light most favorable to its proponent, maximizing its probative value and minimizing its prejudicial effect." *United States v. Zipkin*, 729 F.2d 384, 389 (6th Cir.1984).

 For a Rule 403 violation to occur, the admitted evidence must result in "unfair prejudice" in that "the evidence must suggest a decision on an impermissible basis." *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir.1988). Unfair prejudice " 'does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest decision on an improper basis.' " *Id.* at 335 (quoting *United States v. Mendez–Ortiz*, 810 F.2d 76, 79 (6th Cir.1986), *cert. denied*, 480 U.S. 922, 107 S.Ct. 1384, 94 L.Ed.2d 697 (1987)). Here, the evidence and the testimony were clearly probative because they linked Bonds to the murder scene when no direct evidence existed to do so. The aura of reliability surrounding DNA evidence does present the prospect of a decision based

---

**23.** Federal Rule of Evidence 706 [Court Appointed Experts] states in part:

 **(a) Appointment.** The court may on its own motion or on the motion of any party enter an order to show cause why expert witnesses should not be appointed, and may request the parties to submit nominations. The court may appoint any expert witnesses agreed upon by the parties, and may appoint expert witnesses of its own selection....

**24.** Defendants argue that prejudice was apparent because DNA evidence is alleged to be infallible; the prosecution indicated that the DNA matches were as good as fingerprint matches; the lab scientist, Adams, did not "call" or acknowledge an anomalous band on the blood sample from the van, which would have excluded Bonds as

the donor; and Adams made an incorrect statement that DNA markers and conventional genetic markers (e.g., blood type) are independent tests and thus multiplying high probabilities as to each test would create an even higher probability that defendant was the donor of the blood in the van.

**25.** Federal Rule of Evidence 403 reads:

 Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.

5

**568**

on the perceived infallibility of such evidence, especially in a case such as this where the evidence is largely circumstantial. However, the damaging nature of the DNA evidence to defendants and the potential prejudice does not require exclusion. We have found that the theory of matching DNA patterns and the FBI's procedures were scientifically valid. Defendants had an opportunity to cross examine all of the Government's witnesses to show why the results were unreliable, the procedures flawed, and the DNA evidence not infallible. And, defendants' concern that the jury relied unduly on this circumstantial DNA evidence cannot be resolved by excluding the evidence under Rule 403. Their concern is accommodated through a Rule 29 motion for judgment of acquittal to assure that the Government produced enough evidence, circumstantial or direct, to support a jury verdict. See Daubert, —— U.S. at ——, 113 S.Ct. at 2798 ("the court remains free to direct a judgment and likewise to grant summary judgment") (citations omitted); United States v. Reifsteck, 841 F.2d 701, 703 (6th Cir.1988). Therefore, the district court did not abuse its discretion in finding that the probative value outweighed any prejudice.

### G. Conclusion

Thus, because the theory, methodology, and reasoning used by the FBI lab to declare matches of DNA samples and to estimate statistical probabilities are scientifically valid and helpful to the trier of fact, we affirm the district court's conclusion that they are admissible under Rule 702. In addition, we affirm the admission of the testimony based on the DNA evidence in light of the other rules of evidence. Our conclusion is not altered by the fact that there are numerous substantive, heated disputes over the procedures that the FBI used and over the accuracy of the results that these procedures produced. We find that the DNA testimony easily meets the more liberal test set out by the Supreme Court in Daubert.

### III. Sufficiency of Affidavit for Warrant to Search Yee's Car

■ At trial, the defense objected to the introduction of evidence seized from Mr. Yee's car, which included 9–mm shell casings that fit a MAC–11, hair and blood from the back seat matching Bonds's, and various fibers, such as those from the wool glove found on Route 2 that the FBI lab used to connect the defendants to the crime. The defense argued that had the Government included in the affidavit Miss Graf's statement that the photo of Yee's car did not look like the car she saw at the murder scene and the eyewitness accounts describing the gunman who confronted the witnesses as a person shorter, lighter in weight, and of a different race than Yee, the magistrate never would have issued the search warrant, since probable cause would not have been established. Further, they argued, the Government failed in its duty to inform the issuing magistrate of the unsuccessful result of the photo lineup that took place after the agents secured the warrant. In response to this objection, the district court had the magistrate hold a Franks hearing.[26] The magistrate recommended overruling the objection; after reviewing the magistrate's recommendation de novo the district court adopted it.

■ We review for clear error the conclusions of the district court as to reckless disregard for the truth and intent to deceive,

26. Franks v. Delaware, 438 U.S. 154, 98 S.Ct. 2674, 57 L.Ed.2d 667 (1978) recognized a defendant's right to challenge the sufficiency of previously issued and executed search warrants. To obtain a hearing, the defendant must allege that the government affiant engaged in "deliberate falsehood" or "reckless disregard for the truth" in obtaining the warrant, specifically pointing to the disputed portions of the challenged affidavit, and must back up these charges with an offer of proof. Franks, 438 U.S. at 171, 98 S.Ct. at 2684. If the defendant does this, the court must then reconsider the affidavit without the disputed portions (or, in this case, including the omitted portions) and determine whether probable cause still exists. If not, the matter goes to a full evidentiary hearing, at which the parties start at square one again and the reviewing court will determine, upon the evidence presented, whether the affidavit was properly submitted. At the hearing, the defendant must show "by a preponderance of the evidence, that false statements were made either intentionally or with reckless disregard for the truth and that without these statements there is insufficient content in the affidavit to support a finding of probable cause." United States v. Bennett, 905 F.2d 931, 934 (6th Cir.1990).

since these are issues of fact that reflect the affiant's credibility. *United States v. Giacalone,* 853 F.2d 470, 477 (6th Cir.1988); *United States v. Ritter,* 752 F.2d 435, 439 (9th Cir. 1985). The Government's excuse for its omissions was simple negligence, that the affidavit was prepared in haste and that the attorney who prepared the affidavit forgot to include the Graf statements and the eyewitness descriptions of the gunman. Once the search warrant had been obtained, the agents said, they did not think "inconclusive" photo array results needed to be brought to the magistrate's attention. The magistrate believed the testimony, as did the district court; both concluded that the defense had not shown by a preponderance of the evidence that the Government affiant had "in fact entertained serious doubts as to the truth" of the affidavit. *United States v. Williams,* 737 F.2d 594, 602 (7th Cir.1984), *cert. denied,* 470 U.S. 1003, 105 S.Ct. 1354, 84 L.Ed.2d 377 (1985).

While the defense rails against the sudden onset of the "disease" of "collective amnesia," nothing in the record and nothing in the *Franks* hearing transcript suggest that either the magistrate or the district court disregarded the evidence in coming to their conclusions. Instead of pointing to objective evidence that the affiant lied, the defense asks us to hold that the omitted information was so vital to the existence of probable cause that its absence showed *"per se* reckless[ness]," citing *United States v. Namer,* 680 F.2d 1088 (5th Cir.1982) and *United States v. Martin,* 615 F.2d 318 (5th Cir.1980). Ms. Graf's testimony "obliterated" the "sole evidentiary nexus" between the Yee car and the crime, argues defense counsel. However, both the magistrate and the district court found that considerable circumstantial evidence mentioned in the affidavit independently connected both the defendants and the Yee car to the crime scene. The district court thus held that the fact of the omissions,

without more, does not show recklessness on the part of the affiant; on review of the record, we see no reason to disagree.[27]

### IV. Sufficiency of the Affidavit to Seize Blood and Hair from John Bonds

■ Bonds challenges the validity of the search warrant obtained for the purpose of taking hair and blood samples from his person. He first objects that while the affidavit purported to establish probable cause that he violated federal racketeering laws, the facts included in the affidavit describe only the murder of David Hartlaub, and that a single murder does not "a pattern of racketeering activity" make. The Government responds that since Bonds did not make this objection at trial, he has waived his right to raise it on appeal, citing *United States v. Nagi,* 947 F.2d 211, 213 (6th Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 2309, 119 L.Ed.2d 230 (1992). The record shows that Bonds did move before the trial court to suppress this evidence on the sufficiency of the affidavit; however, as the Government correctly points out, the defense did not raise this specific issue. We therefore hold that Bonds waived his right to appeal the first issue he presents, *see Nagi,* 947 F.2d at 213, and we move on to the merits of the next question, which the defense did raise at trial.

■ The defense questions the propriety of including in the Bonds affidavit what it deems "uncorroborated" information from a confidential source, who apparently heard from a relative of Bonds's that he was involved in the murder of a person affiliated with the Outlaws gang who was driving a van and making a night bank deposit. This information alone ties Bonds to the crime, the defense argues, and is completely untrustworthy and conclusory. Both the magistrate and the district court disagreed. Reviewing the affidavit for the second time on Bonds's

27. Where the defendant sufficiently proves that an affidavit rested on deliberate falsehood or a reckless disregard for the truth, the reviewing court must set aside those tainted portions of the affidavit (or in the case of deliberate or reckless omissions, include them in the affidavit) and then determine whether probable cause still exists. If so, the affidavit, and the warrant, stand. *Ben-*

*nett,* 905 F.2d at 934 (citing *Franks,* 438 U.S. at 155–56, 98 S.Ct. at 2676). Since we affirm the district court's holding that neither deliberate falsehood nor reckless disregard for the truth undergirded the affidavit supporting the Government's petition for a warrant to search Yee's car, we do not reach this second question.

motion to suppress, and following a hearing, the magistrate found the information "trustworthy." The magistrate noted the Government's testimony at the hearing that the relative would not have heard of the details of the Hartlaub murder through the Cleveland-area media, Sandusky being some sixty miles from Cleveland.[28] The magistrate discounted the defense's "speculative" argument that the relative may have lived in Sandusky, heard about the crime, and fingered Bonds as the culprit.

In reaching this conclusion, the magistrate noted that the affidavit included additional credible evidence linking Bonds to the crime. FBI Agent Shoaff, who follows the goings on of the Hell's Angels, had told the affiant that local tradition dictated that prospective members had to "roll their bones," or commit a murder or other serious crime in the presence of a full member as a prerequisite to induction into the gang. A "reliable and credible informant" had told the FBI that Bonds had been inducted into the Hell's Angels shortly after the murder; Agent Shoaff later saw Bonds wearing the gang's "colors," that is, the trademark leather jacket bearing the insignia of the Hell's Angels, a privilege reserved for full members. The magistrate also gave great weight to Bonds's absence from work on the day of the crime, the presence of Yee, Verdi, and an unidentified white male in Yee's car a short distance away from the crime scene fifteen minutes after the murder, Bonds's suddenly appearing with an injured arm the day after, and the inconsistent reasons Bonds apparently gave various people for the injury.

Recommending that the district court deny the motion to suppress, the magistrate concluded that the affidavit established probable cause and that the underlying evidence connecting Bonds to the crime was sufficient and independently corroborated by credible testimony. The district court reviewed the recommendation for clear error and adopted it.

The court of appeals reviews the determinations of the magistrate with "great deference"; de novo review of the sufficiency of a

search warrant affidavit is inappropriate. *United States v. Davidson,* 936 F.2d 856, 859 (6th Cir.1991). "Probable cause exists when there is a 'fair probability,' given the totality of the circumstances, that contraband or evidence of a crime will be found in a particular place." *Id.* (quoting *United States v. Loggins,* 777 F.2d 336, 338 (6th Cir.1985) (per curiam)). On the basis of the record as described, and the law as applied by the magistrate and the district court, we conclude that the record supports the finding of probable cause below and hold that neither the magistrate nor the district court clearly erred in denying Bonds's motion to suppress the evidence seized from his person.

## V. Sufficiency of the Affidavit to Search Verdi's Home

The defense sought to suppress the evidence seized from Mark Verdi's home after the state search at which federal agents were present, arguing that the state search, conducted in connection with a bank fraud investigation, was merely a pretext for the federal agents to get into the house. The bank fraud investigation did not require a search of Bonds's home, the defense argues, and the explanatory testimony of Detective Doyle, the state officer who obtained the initial warrant and led the search, was "incredible." The defense points to the pre-search meeting attended by the federal and state officers as additional proof of the pretextual nature of the state search.

The magistrate held an extensive suppression hearing where the state and federal officers explained the circumstances of the search and the defense had the opportunity to cross-examine fully the witnesses and otherwise attempt to cast doubt on the Government's account of the search. The magistrate found that no probable cause existed for a federal warrant prior to the state search. He concluded that Detective Doyle had obtained a valid state search warrant in the course of his bank fraud investigation without the prior knowledge of involvement of the federal agents, and that FBI Agent

---

**28.** All the defendants resided in the greater Cleveland area, which is not considered to encompass Sandusky.

Shoaff did not compromise Verdi's constitutional rights in tagging along. As an observer, Shoaff had briefed the searching officers about the Hartlaub murder and described the type of evidence that might turn up at Verdi's home; he asked the officers to tell him if and when they found something of interest. He did not personally search the house. The magistrate further found that Shoaff neither seized evidence nor had the state officers do so on his behalf prior to his securing a federal warrant later in the day. This warrant the magistrate concluded was based on probable cause. The magistrate found "no factual basis for impugning any improper motive, much less unconstitutional consequences ... to [Agent Shoaff's] actions or those of any of the other federal agents." Only with regard to the federal seizure of the MAC–11 and the pistol from the log bin did the magistrate think there might be a problem, and recommended a hearing to develop more facts on whether their discovery was inadvertent and whether searching the log bin exceeded the scope of the warrant.

The district court adopted the magistrate's findings of fact as described, agreeing that the state warrant was not simply a pretext for a warrantless federal search, and holding further that the search of the log bin was "not unreasonable," being within the scope of the search, and that the agents' discovery of the guns was therefore inadvertent. The incriminating nature of the guns was immediately apparent to the agents, the district court reasoned, and their seizure did not exceed constitutional bounds. As before, the district court's adoption of the magistrate's findings of fact we review with due deference. *Davidson,* 936 F.2d at 859.

■■■■■ In this circuit, a federal agent may "tag along" on a state search without tainting evidence of federal crimes uncovered in the process if he has no probable cause to search which would allow him to obtain a separate federal warrant. *United States v.*

*Sanchez,* 509 F.2d 886 (6th Cir.1975); *see also United States v. Hare,* 589 F.2d 1291 (6th Cir.1979). Appellants call this rule "absurd" and "unworkable"; nonetheless, while they may convince law review editors that the relevant Sixth Circuit precedent on the issue of "tag along" searches is misguided, it not only binds this court but has also been found persuasive by other similarly unenlightened benches. *See United States v. Washington,* 797 F.2d 1461 (9th Cir.1986). Furthermore, *Sanchez* and *Hare,* while dealing with similar federal/state cooperation, are distinguishable from the case at bar, as the Government points out. In *Sanchez,* the court objected to the fact that the federal officers participated in a state search for their own purposes, expanding the permitted scope of the state warrant, despite their having probable cause sufficient to have obtained a federal warrant. The agents there had also gone ahead and seized the items they were after without first obtaining a separate warrant, and in any event without satisfying the "plain view" doctrine. Here, on the other hand, there is no indication that Agent Shoaff either participated actively in the search, seized items himself, or ordered items to be seized.[29]

As the magistrate discussed, in *Washington,* the court followed *Hare* and *Sanchez,* saying that "purpose, not inducement" by the Government is the key to whether a state warrant is merely a pretext for an otherwise baseless search. *Washington,* 797 F.2d at 1471. The search warrant validated by the *Washington* court was very similar to the one at bar; the court held that the district court's "finding that the state search was made in good faith is dispositive of the issue.... [The state search was] a 'serious[,] valid, investigation' and not 'a pretense fabricated to mask the [federal officers'] lack of probable cause.'" *Id.* (citing *Hare,* 589 F.2d at 1296). While Agent Shoaff surely had a hunch as to what he might find at Verdi's

29. As the Government correctly points out, the Supreme Court has since eliminated the requirement that seizures in plain view by a "tag along" officer must be of evidence inadvertently discovered. The "word games" the defendants accuse the Sixth Circuit of playing in *Hare* to figure out what the Supreme Court meant by "inadvertent" therefore no longer need be played; any discovery of incriminating evidence in plain view, whether or not the officer expects to find it in the course of a search, is admissible. *See Horton v. California,* 496 U.S. 128, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

home, the defense's bald assertions that his participation in the search was somehow *per se* impermissible have been rejected twice below, and we now reject them once more. The state search was proper, Agent Shoaff did not exceed his bounds in "tagging along," and the record does not tell a tale contrary to the findings of fact adopted by the district court; similarly, the district court's conclusions of law were not erroneous.

## VI. Admission of the MAC–11 Gun Seized from Mark Verdi's Home

The defense objects to the district court's admission of the MAC–11 machine gun found in the log bin in Verdi's home, citing Fed. R.Evid. 403 and 404(b). The court admitted the gun to show identity; the debate has been over how the gun accomplished this purpose. The defense claims that the Government actually attempted to show a criminal "signature" in Verdi's possession of a MAC–11, identical in make to the murder weapon, and from which the serial number had similarly been removed. The Government denies this, arguing that it introduced the gun simply to establish identity through "motive, preparation, plan and preference." The FBI labs "raised" the obliterated serial number on the murder weapon and traced that weapon's ownership to Donald Myers, a former roommate of Yee's. At trial, Myers testified to having owned two MAC–11's, which he said had been stolen from his car as it was parked in front of Yee's apartment; shown the Verdi gun, he could not positively identify it, but said that it looked like one of the missing guns. However, appellants argue that since thousands of MAC–11's legally circulate in the public, and since different methods were used to rub out the serial numbers, the similarity between the weapons necessary to show identity was not established, notwithstanding Myers's testimony.

■■■■ Although admissions of evidence under Rule 404(b) are often said to be reviewed for abuses of discretion, *United States v. Rodriguez*, 882 F.2d 1059, 1064 (6th Cir.1989) *cert. denied*, 493 U.S. 1084, 110 S.Ct. 1144, 107 L.Ed.2d 1048 (1990), this circuit has recently held that a more precise statement of the standard of review is that the court must determine first, as a matter of fact, whether there is sufficient evidence that the prior act occurred, and second, whether as a matter of law, the "other act" allegedly committed by the defendant was admissible as evidence of "intent, preparation, [or] plan." *United States v. Gessa*, 971 F.2d 1257 (6th Cir.1992) (en banc). Here the record amply supports an affirmative finding as to both factors. Myers's testimony, if believed by the court, established that two MAC–11's, one of which had been proven to be the murder weapon, were stolen from him at a time and place that one of the defendants had access to them. The Government correctly points out that evidence that Verdi possessed the MAC–11 found in his log bin is relevant to the issue of identity through evidence of motive, preparation, or plan. The Government further correctly notes that to establish identity, it need not show exact similarity between the guns; dissimilar things or acts may identify people just as effectively. *United States v. Czarnecki*, 552 F.2d 698, 702 (6th Cir.), *cert. denied*, 431 U.S. 939, 97 S.Ct. 2652, 53 L.Ed.2d 257 (1977). At oral argument, the Government suggested, as illustration, that had Myers been relieved of a MAC–11 and a shotgun, the former used as the murder weapon, and an identical shotgun later found in a suspect's possession, the establishment of identity would be just as strong. The test in admitting evidence to show identity under 404(b) is one of relevance; hence, finding an identical MAC–11 with obliterated serial numbers in Verdi's possession "tends to make it more probable than if [Verdi] had not possessed" such a gun that the MAC–11 was stolen along with the murder weapon in connection with the plot to take revenge on the Outlaws. *United States v. Evans*, 848 F.2d 1352, 1360 (5th Cir.), *modified*, 854 F.2d 56 (5th Cir.1988).

■■■■ Once a piece of evidence satisfies 404(b)'s criteria for relevance, the court must further determine whether that evidence is "more unfairly prejudicial than probative, which is governed by an abuse of discretion standard." *Gessa*, 971 F.2d at 1262. We review the disputed evidence "in the light most favorable to its proponent." *United States v. Schrock*, 855 F.2d 327, 333 (6th

Cir.1988). We conclude that the district court properly admitted Verdi's MAC–11's, and that no undue prejudice resulted. While owning a machine gun may suggest lawlessness in some jurors' minds, the gun's presence in Verdi's home was not the only straw on the camel's back. Among other things, the missing serial number, the presence of plastic bags and electric tape in the log bin with the gun, and Mr. Myers's testimony about his two stolen MAC–11's all factored into the Government's case; indeed, it would be difficult to countenance excluding as unfairly prejudicial a gun with an obliterated serial number in a prosecution for possession of a firearm with an obliterated serial number. Further, we note that the district court allowed the defense the jury instruction on this matter. Since we do not believe the Verdi MAC–11 " 'arouse[d] the jury's hostility ... [against] one side without regard to the probative value of the evidence,' " *Schrock*, 855 F.2d at 335 (quoting C. McCormick, *McCormick on Evidence* § 185 at 545 (1984)), and since there is no "showing that the challenged evidence invite[d] the jury to decide the case on an improper basis," *id.*, we affirm the district court's admission of the MAC–11 found in Verdi's home under Rules 404(b) and 403.

VII. Admission of Testimony of Anthony Tait and Officer Robert Schurman

■ The defense objects on grounds of relevance and unfair prejudice to the admission of the testimony of Tait, a Hell's Angels officer-turned-government-informant, and of Schurman, the Illinois police officer who responded to the Joliet shooting for which the defendants allegedly tried to retaliate. In addition, the defendants argue that Tait's testimony was replete with inadmissible hearsay, none of it provably uttered in furtherance of the charged conspiracy.

The Government introduced considerable evidence of a wide Hell's Angels conspiracy to retaliate for the Joliet shooting, gathered from a wealth of sources including, but not limited to, Tait and Schurman. Tait testified that he served as "west coast sergeant-at-arms" for the national Hell's Angels organization, and that one of his primary duties was to serve as liaison between the east and west coast clubs. He said that he attended an east coast officers' meeting in September 1987 to which the Cleveland officers unexpectedly did not come. Inquiring after them, he was told that Yates, the president of the Cleveland club, Bonds, a prospective member, and another Hell's Angel had been in a fight with Outlaws members in Joliet, that the Outlaws had stolen the Hell's Angels' "colors," something Tait described as "the ultimate insult," and had shot Yates in the leg. He said the officers present then discussed retaliation plans.

Agent Shoaff, who followed the Hell's Angels' activities in the Cleveland area, testified that he heard essentially the same story from his confidential sources about the plot, and he also collected evidence about the defendants' participation in the gang and Bonds's and Verdi's later initiation into the gang, which corroborated the testimony of Tait and Schurman about their connection to the gang and the plot. Officer Schurman gave first-hand testimony about the Joliet incident, who was there, and how the assault apparently occurred. Schurman's testimony largely corroborated Tait's and Shoaff's testimony.

■ The Government correctly argues that in this circuit, the coconspirator exception to hearsay only requires that the proponent of the testimony show by a preponderance of the evidence that *some* conspiracy existed, not necessarily the one charged, *see United States v. Horton*, 847 F.2d 313, 323–24 (6th Cir.1988), that the defendant against whom the hearsay is offered was a member of the conspiracy, and that the hearsay statement was made "during the course of and in furtherance of the conspiracy." Fed.R.Evid. 801(d)(2)(E); *see Bourjaily v. United States*, 483 U.S. 171, 176, 107 S.Ct. 2775, 2779, 97 L.Ed.2d 144 (1987). Further, "[t]he hearsay itself may be utilized in making this initial determination." *Horton*, 847 F.2d at 323 (citing *Bourjaily* ). We agree with the district court that the record supports a finding that a conspiracy had been shown, and that the statements recounted by Anthony Tait were made in furtherance of an ongoing conspiracy.

The defendants argue that Anthony Tait's testimony regarding the September 1987 meeting of the east coast officers and Officer Schurman's eyewitness testimony of the aftermath of the Joliet shooting was irrelevant and prejudicial. However, this testimony goes to the motive behind the killing, especially when tied in with the other evidence agents had collected about the plot.

As we have discussed above, the admission of evidence challenged as prejudicial is reviewed for an abuse of discretion, in the light most favorable to the proponent. *United States v. Zipkin*, 729 F.2d 384, 389–90 (6th Cir.1984); *United States v. Schrock*, 855 F.2d 327, 333 (6th Cir.1988). In looking at the disputed evidence, we must "maximize its probative value and minimize its prejudicial effect"; we cannot reverse the district court's admission merely because we might have excluded the evidence if faced with the decision at trial. *See id.* As we have explained, Tait's and Schurman's testimony undoubtedly made it more likely than not that a Hell's Angels conspiracy existed to avenge the Outlaws' attack in Joliet; further, it explained Bonds's motives in participating in the crime. While considerable independent evidence tied Bonds and the other defendants to the conspiracy and the crimes of conviction, it was this testimony that secured the knot. Thus, we believe that admitting Tait's and Schurman's testimony did not impermissibly arouse hostility among the jurors against the defendants. *Schrock*, 855 F.2d at 335. Similarly, there is no "showing that the challenged evidence invite[d] the jury to decide the case on an improper basis." *Id.*

We therefore affirm the district court's admission of the testimony of Anthony Tait and Officer Schurman as not prejudicial under Fed.R.Evid. 403.[30]

The defendants also invoke the Confrontation Clause of the Sixth Amendment, claiming that they had a right to know the identity of the original sources of information upon which Tait relied. The Government responds correctly that once it has leapt the hurdles of the coconspirator exception, no independent indicia of reliability or proof of declarant unavailability are required for the testimony to pass constitutional muster. *See Bourjaily; United States v. Inadi*, 475 U.S. 387, 106 S.Ct. 1121, 89 L.Ed.2d 390 (1986).

### VIII. Sufficiency of the Government's Proof of the Conspiracy

Lastly, we easily dispose of the defendants' argument that the conspiracy to obtain and possess the silencer ended when the defendants received or came into possession of the silencer, and that therefore the Government may not allege acts done in furtherance of the conspiracy which took place after that occurred. As the Government correctly argues, the law prohibits possession as well as receipt of the silencer; therefore the crime ended when the murderers abandoned the M–11, with silencer attached, in Mr. Hartlaub's van. True, a conspiracy ends when its criminal ends are accomplished, *United States v. Silverstein*, 737 F.2d 864 (10th Cir.1984), but possession of contraband is a continuing crime in itself, *United States v. Lawson*, 872 F.2d 179 (6th

---

**30.** We also note that evidence of motive in an organized crime conspiracy often requires that the jury be informed of " 'other wrongful circumstances with which [the crime charged] is inextricably entwined' ... 'in order to complete the story of the crime on trial.' " *United States v. Mills*, 704 F.2d 1553, 1559 (11th Cir.1983) (quoting 2 J. Weinstein & M. Berger, *Weinstein's Evidence* § 404[10] (1982) and *United States v. Wilson*, 578 F.2d 67, 72 (5th Cir.1978)), *cert. denied*, 467 U.S. 1243, 104 S.Ct. 3517, 82 L.Ed.2d 825 (1984). In *Mills*, a case very similar to this one, the Government charged the defendant, a federal inmate, with murder and conspiracy to commit murder. The Government put forth evidence that the defendant was a member of a prison gang, who killed another inmate suspected of cheating a fellow gang member. The court af-

firmed the admission of substantial testimony regarding the beliefs, practices, and indeed, the very existence of the "Aryan Brotherhood," a "white supremacist prison gang" which the court described as "a covert organization ..., a culture strange and foreign to a lay jury even in its most obvious aspects." *Mills*, 704 F.2d at 1555, 1559. Since the Aryan Brotherhood's practices related intimately to the murder, the court held the challenged evidence relevant and not prejudicial: " 'Relevant evidence is inherently prejudicial; but it is only *unfair* prejudice, *substantially* outweighing probative value, which permits exclusion of relevant matter under Rule 403.' " *Mills*, 704 F.2d at 1560 (quoting *United States v. McRae*, 593 F.2d 700, 707 (5th Cir.), *cert. denied*, 444 U.S. 862, 100 S.Ct. 128, 62 L.Ed.2d 83 (1979)).

Cir.1989), *cert. denied,* 493 U.S. 834, 110 S.Ct. 110, 107 L.Ed.2d 72 (1989). Thus, for as long as the defendants kept and used the silencer, they were committing the crime of possession and continuing their conspiracy to that end.

IX. Conclusion

The defendants' assignments of error are overruled and their convictions are **AFFIRMED.**