**Beverly Lynn HUFFMAN, Individually and as Executrix of the Estate of Dennis Allen Huffman, Deceased, Plaintiff,**

v.

**SMITHKLINE BEECHAM CLINICAL LABORATORIES, INC., et al., Defendants.**

**No. 3:99CV7138.**

United States District Court, N.D. Ohio, Western Division.

June 20, 2000.

Steven P. Collier, Connelly, Jackson & Collier, Toledo, OH, for Plaintiff.

Robert M. Anspach, Law Offices of Robert M. Anspach & Associates, Toledo, OH, Margaret J. Lockhart, Cooper, Walinski & Cramer, Toledo, OH, Omni Praiss, St. Louis, MO, Mark Zellmer, St. Louis, MO, for Defendants.

### ORDER

CARR, District Judge.

This is a diversity jurisdiction case in which plaintiff alleges that defendants negligently diminished her husband's chances of surviving colon cancer by failing properly to notify him of the severity of his blood test results taken as part of his employer's "wellness program." Pending are Defendant SmithKline Beecham Clinical Laboratories, Inc.'s (SmithKline Beecham) motion for summary judgment, (Doc. 51), and Defendant Whirlpool Corporation's (Whirlpool) motion for summary judgment. (Doc. 18). For the following reasons, defendants' motions for summary judgment shall be denied.

### BACKGROUND

Plaintiff is the widow of Dennis Huffman. Mr. Huffman worked for Whirlpool in Findlay, Ohio from 1972 until the time of his death in October 1998.

Whirlpool maintains a health center at its production plant in Findlay, Ohio. For each of the three plant shifts, Whirlpool staffs a nurse at the health center. In addition, Whirlpool employs an on-site doctor one hour per day, four days a week.

As a benefit to its employees, Whirlpool also conducts a "wellness program," as part of which employees and their spouses are offered a free, annual mini-physical examination. The mini-physical includes, among other things, an analysis of a sample of the participant's blood.

On January 14, 1998, Mr. Huffman had his annual mini-physical examination. His blood sample was sent to SmithKline Beecham for analysis.

About three weeks later, Mr. Huffman received in the mail a copy of his blood test results and a "Personal Wellness Report." His blood profile indicated that Mr. Huffman's hemoglobin level was abnormally low, and that further examination should be undertaken. The materials sent to Mr. Huffman, however, contained no explanation of the significance of the low hemoglobin reading.

About a week to ten days after receiving the report, Mr. Huffman asked a nurse at Whirlpool about the meaning of a low hemoglobin level. The nurse told Mr. Huffman that it might mean that he was anemic, and that he should see his doctor. She also asked Mr. Huffman to bring the blood profile to the health center.

Aside from purchasing iron tablets, Mr. Huffman did nothing further about the blood report until March 18, 1998, when Mr. Huffman's wife told their family physician, Dr. Kose, about his blood test results. Dr. Kose informed Mrs. Huffman that her husband should come in immediately to have his blood work redone. Within two days Mr. Huffman saw Dr. Kose, who took another blood sample that confirmed Mr. Huffman's low hemoglobin level.

On March 25, 1998, Mr. Huffman had a colonoscopy, which indicated that he had colon cancer. The following day, Mr.

Huffman underwent a right colonectomy. During the colonectomy, the surgeon, Dr. Echavarre, examined Mr. Huffman's liver, visually and by palpitation, and concluded that the cancer had not spread to his liver. But because the cancer had spread to five lymph nodes, Mr. Huffman was diagnosed with Stage C colon cancer.

Mr. Huffman was treated post-surgically for his cancer. On April 14, 1998, Mr. Huffman was re-examined and the cancer was found to have spread to his liver. As a result, he was diagnosed with Stage D colon cancer, which is not curable. Mr. Huffman died on October 1, 1998.

Dr. Sharon Cole, an oncologist, was one of Mr. Huffman's treating physicians. She has testified that colon cancer is a progressive disease, and that Mr. Huffman's cancer was the most aggressive cancer that she ever has treated. Dr. Cole also testified that the further the disease progresses, the less treatable it becomes. In her view, had Mr. Huffman's condition been diagnosed when he first was informed of his low hemoglobin level, his chances of survival would have been increased.

Dr. Cole also testified that, in her opinion, Mr. Huffman had Stage C cancer (which is treatable), on March 26, 1998, rather than Stage D cancer (as first confirmed on April 15, 1998, and which is not treatable). Her opinion is based solely on Dr. Echavarre's examination and post-surgical conclusion that the cancer had not spread into Mr. Huffman's liver. Dr. Cole did not perform a CT scan on Mr. Huffman at the time he was diagnosed with Stage C cancer.

Plaintiff filed this action against Whirlpool and SmithKline Beecham alleging that they were negligent in interpreting, evaluating and providing blood test results to plaintiff's deceased husband, Mr. Huffman. As a result of defendants' alleged negligence, plaintiff claims that her husband's chances of surviving colon cancer were diminished.

Whirlpool argues that it is entitled to summary judgment because 1) it is immune from liability under the Ohio Constitution and Ohio Workers' Compensation Law, 2) it is immune from liability under the fellow-servant rule, and 3) reasonable minds could not conclude that it acted negligently.

In addition, Whirlpool and SmithKline Beecham both move for summary judgment on the ground that plaintiff cannot prove causation. In particular, defendants argue that plaintiff's sole causation expert, Dr. Sharon Cole, should be excluded because her testimony cannot satisfy the admissibility criteria established under *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and *Roberts v. Ohio Permanente Medical Group, Inc.*, 76 Ohio St.3d 483, 668 N.E.2d 480 (1996).

## STANDARD OF REVIEW

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the record which demonstrate the absence of a genuine issue of material fact. *Id.* at 323, 106 S.Ct. 2548. The burden then shifts to the nonmoving party who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986) (quoting Fed.R.Civ.P. 56(e)).

Once the burden of production shifts, the party opposing summary judgment cannot rest on its pleadings or merely reassert its previous allegations. It is insufficient "simply [to] show that there is some metaphysical doubt as to the material facts." *Matsushita Elec. Indus. Co. v.*

*Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986). Rather, Rule 56(e) "requires the nonmoving party to go beyond the [unverified] pleadings" and present some type of evidentiary material in support of its position. *Celotex,* 477 U.S. at 324, 106 S.Ct. 2548.

In deciding the motion for summary judgment, the evidence of the non-moving party will be believed as true, all doubts will be resolved against the moving party, all evidence will be construed in the light most favorable to the non-moving party, and all reasonable inferences will be drawn in the non-moving party's favor. *Eastman Kodak Co. v. Image Technical Services, Inc.,* 504 U.S. 451, 456, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992). Summary judgment shall be rendered only if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c).

## DISCUSSION

### I. Dual Capacity Exception

Whirlpool argues that it is entitled to immunity from plaintiff's claims under the Ohio Constitution and Ohio Workers' Compensation Laws. Plaintiff counters that summary judgment is not appropriate because genuine issues of material fact exist as to whether Whirlpool acted in a "dual-capacity," and thereby is excluded from workers' compensation immunity. I agree with plaintiff.

Section 35, Article II of the Ohio Constitution grants authority to the Ohio General Assembly to establish a workers' compensation program and expressly provides that such compensation is the exclusive remedy of an employee who has been injured within the course of his or her employment. The exclusivity provision set forth in the Ohio Constitution has been unambiguously codified in Ohio Workers' Compensation Laws at O.R.C. § 4123.74.

Here, it is uncontested that Whirlpool was in full compliance with the workers' compensation statutes. Thus, unless plaintiff can show that Whirlpool had a "dual capacity" relationship with her husband at the time of the allegedly negligent act, plaintiff's exclusive remedy would be her husband's workers' compensation benefits. *See, e.g., Freese v. Consolidated Rail Corp.,* 4 Ohio St.3d 5, 7–8, 445 N.E.2d 1110 (1983).

■ Under the dual-capacity doctrine, " 'an employer normally shielded from tort liability by the exclusive remedy principle may become liable in tort to his own employee if he occupies, in addition to his capacity as employer, a second capacity that confers on him obligations independent of those imposed on him as employer.' " *Id.* at 7, 445 N.E.2d 1110 (quoting 2 Larson's Workmen's Compensation, Section 72.80 (Desk Ed.1982)).

The dual-capacity doctrine was first adopted in Ohio in *Guy v. Arthur H. Thomas Co.,* 55 Ohio St.2d 183, 378 N.E.2d 488 (1978). In *Guy,* the plaintiff, a laboratory technician, filed an action to recover from her employer, the defendant hospital. *Id.* at 189–190, 378 N.E.2d 488. The plaintiff, who contracted mercury poisoning in the course of her employment, alleged that she had been injured by the medical malpractice of the defendant hospital while confined there as a patient for treatment. *Id.* at 184–185, 378 N.E.2d 488.

In reaching its decision that the employer occupied a dual capacity, the Ohio Supreme Court held that "the decisive test of dual-capacity is not how separate the employer's second function is from the first, but whether the second function generates obligations unrelated to those flowing from the first, that of an employer." *Id.* at 188, 378 N.E.2d 488 (citing 2A Larson, Workmen's Compensation Law, § 72.80 at 14–117 (1976)). Thus, because the defendant hospital had obligations toward the plaintiff unrelated to and independent of those imposed upon it as an employer, the court

determined that plaintiff's action was not barred by worker's compensation laws. *Id.* at 186, 378 N.E.2d 488.

Subsequently, in *Freese,* the Ohio Supreme Court reiterated the test articulated in *Guy:*

> Whatever the test applied to determine the status of the party claimed to owe an obligation, be it based upon a consideration of whether there exists an unrelated or independent relationship of the parties other than employer and employee, or whether the employment relationship is incidental or predominant, the same result may be reached. In either approach, *what must be determined is whether the employer stepped out of his role as such, and had assumed another hat or cloak.*

*Freese,* 4 Ohio St.3d at 10–11, 445 N.E.2d 1110 (emphasis added).

■ Here, plaintiff alleges that her husband was injured as a result of his participation in Whirlpool's wellness program. The wellness program was a voluntary program offered by Whirlpool in which Whirlpool provided mini-physicals to its employees and their spouses to evaluate their health and recommend healthy lifestyle changes. Whirlpool did not require its employees to participate. Nor was Whirlpool required by law to provide the mini-physicals.

Mr. Huffman participated in the annual mini-physicals provided by Whirlpool, and the record evidence shows that he did so in lieu of having a regular physical examination with his personal physician. Further, plaintiff alleges that, as part of the wellness program, Whirlpool failed to adequately inform Mr. Huffman that his abnormally low hemoglobin level could indicate a serious medical problem. As a result, Mr. Huffman's diagnosis with colon cancer was delayed by seven weeks and his chances of surviving were diminished.

Viewed in the light most favorable to plaintiff, this evidence is sufficient to raise a genuine issue of material fact as to whether the Whirlpool wellness program went beyond providing work-related health care and assumed a second status of personal medical care provider to its employees and their spouses. *See McGee v. Goodyear Atomic Corp.,* 103 Ohio App.3d 236, 246–247, 659 N.E.2d 317 (1995) (reversing trial court's entry of summary judgment on the dual-capacity doctrine where genuine issues of material fact existed as to whether employer-provided plant physicians went beyond providing government-mandated occupational health care and assumed second status of personal physician to employees); *Delamotte v. Unitcast Division of Midland Ross Corp.,* 64 Ohio App.2d 159, 164, 411 N.E.2d 814 (1978) (employee may recover in tort where employer sponsors physical examinations that confer obligations that are independent and unrelated to obligations as employer); *see also Chaddock v. Johns–Manville Sales Corp.,* 599 F.Supp. 204, 205 (S.D.Ohio 1984) (whether an employer acts in a dual capacity is a sensitive factual question); *cf. Wojcik v. Aluminum Company of America,* 18 Misc.2d 740, 183 N.Y.S.2d 351, 353–355 (1959) (if employee's tuberculosis was not work-related, Workers' Compensation Law would not be employee's exclusive remedy and employee could maintain tort action against employer for negligent failure to advise employee that physical examinations revealed that employee had or was developing tuberculosis).

Whirlpool, nevertheless, insists that under *Walter v. AlliedSignal, Inc.,* 131 Ohio App.3d 253, 722 N.E.2d 164 (1999), plaintiff cannot show that Whirlpool occupied a dual capacity. In *Walter,* the court held that the defendant-employer did not assume a dual capacity by treating an employee for minor non-occupational injuries at the plant health center. *Id.* at 262–263, 722 N.E.2d 164. The employee in *Walter* began to experience pain through his shoulders, upper back and chest while at work. *Id.* at 256, 722 N.E.2d 164. As a

result, the employee went to the medical department at his place of employment and was examined by a nurse who sent him home. *Id.* After returning to his home, the employee suffered a heart attack and subsequently died. *Id.*

In holding that the defendant-employer did not occupy a dual-capacity, the court focused on the fact that the plant health facility existed to fulfill three purposes: 1) to treat on-duty employees for workplace injuries, 2) to provide work physicals, and 3) to treat minor, non-work-related conditions that interfere with the productivity of on-duty employees. *Id.* at 261, 722 N.E.2d 164. The court also emphasized that the defendant's employees did not view the medical department as their the primary physician's office. *Id.* at 262, 722 N.E.2d 164.

The facts in *Walter* are distinguishable from the facts here. First, the plaintiff in *Walter* was treated while on-duty for a non-work-related condition that was interfering with his productivity. Mr. Huffman, on the other hand, was not treated on-duty for a condition that impaired his productivity. Rather, he participated in Whirlpool's voluntary wellness program which was offered to employees and their spouses and which was designed to evaluate the participant's health and recommend personal lifestyle changes.

Further, although Mr. Huffman did not view Whirlpool's health center to be his primary doctor's office, the record evidence indicates that Mr. Huffman participated in the mini-physicals offered through the wellness program in lieu of a regular physical examination with his physician.

Lastly, unlike the medical center in *Walter*, the health center at Whirlpool was not limited to treating on-duty employees for workplace injuries, providing work physicals, and treating minor, non-work related conditions that interfered with the productivity of on-duty employees. To the contrary, Whirlpool employed its health center to conduct a "wellness program," in which employees *and their spouses* were offered personal—not work related—mini-physical examinations.

These facts alone establish a genuine issue of material fact as to whether Whirlpool stepped outside its capacity as an employer and acted in a dual capacity. *See McGee,* 103 Ohio App.3d at 248, 659 N.E.2d 317 (holding that testimony that plant employees were advised to see their own physicians or seek outside medical help on many non-occupational health complaints shows that genuine issues of material fact remain on the issue of dual-capacity).

Accordingly, Whirlpool's motion for summary judgment on the dual-capacity doctrine shall be denied.

## II. Fellow Servant Rule

Whirlpool further contends that it is immune from liability under the common law fellow-servant rule.[1] But because the fellow servant rule was abolished eighty-nine years ago with the enactment of Workers' Compensation Laws, Whirlpool's argument has no merit.

In Ohio, prior to 1911, an employee attempting to recover damages against an employer for injuries sustained in the workplace had to file a common-law action against his or her employer. *Brady v. Safety–Kleen Corp.,* 61 Ohio St.3d 624, 643, 576 N.E.2d 722 (1991) (Holmes, J., dissenting). Injured employees were required to prove that the employer had a duty of care toward them and that the employer breached that duty. *Johnson v. BP Chemicals, Inc.,* 85 Ohio St.3d 298, 314, 707

---

1. Under the fellow servant rule, an employer cannot be held liable for injuries to an employee caused by the negligence of a fellow employee. *See, e.g., Kelly Island Lime & Transport Co. v. Pachuta,* 69 Ohio St. 462, 467, 69 N.E. 988 (1904) ("The general rule that a common master cannot be made responsible for injuries resulting to a servant from the negligence of a fellow servant is a principle well established in almost all jurisdictions.").

N.E.2d 1107 (1999) (Lundberg Stratton, J., dissenting) (citing Prosser & Keeton, The Law of Torts, Section 80, 569–573 (5 Ed.1984)). In response, employers could raise three defenses: 1) contributory negligence, 2) assumption of the risk, and 3) the fellow servant rule. *Id.* (citing Note, *Exceptions to the Exclusive Remedy Requirements of Workers' Compensation Statutes,* 96 Harv. L.Rev. 1641, 1644 (1983)).

Under this system, however, a great number of work-related injuries went uncompensated because of the legal defenses available to the employer. *Id.; see also Brady,* 61 Ohio St.3d at 643, 576 N.E.2d 722. In response, the Ohio General Assembly enacted Ohio's first workers' compensation law to provide a more equitable system for compensating employees' work-related injuries. *Johnson,* 85 Ohio St.3d at 314, 707 N.E.2d 1107.

Under the Workers' Compensation Act, both the employer and the employee could avoid the burdensome cost of litigation. *Id.* The employee received a prompt recovery for injuries that occurred in the workplace without having to prove negligence. *Id.* In return, the employer no longer was subject to uncertain damages by way of lawsuits, but also could no longer assert any defense. *Id.*[2]

Accordingly, Whirlpool does not have immunity under the fellow servant rule, and I shall deny its motion for summary judgment.[3]

### III. Negligence and Contributory Negligence

■ Whirlpool additionally asserts that it is entitled to summary judgment be-

cause plaintiff cannot establish a prima facie case of negligence. In particular, Whirlpool argues that it 1) had no duty to notify Mr. Huffman of the results of his blood tests; 2) did not fail to implement a procedure to notify employees of serious health conditions; and 3) had no duty to provide complete diagnostic feedback to its employees. Moreover, Whirlpool argues that plaintiff is barred from recovery by contributory negligence. I disagree.

Whirlpool contends that it had no duty to notify Mr. Huffman of the results of his blood tests, But, at the same time, it insists that it did not fail to implement a procedure to notify employees of serious health conditions because it had a procedure to notify employees of results that fell into a "critical range." (*See* Doc. 75 at 15–16). Whirlpool cannot have it both ways. Because Whirlpool agreed to notify employees of blood levels that fell within a "critical range," it was obligated to do so with reasonable care. *See Briere v. Lathrop Co.,* 22 Ohio St.2d 166, 172, 258 N.E.2d 597 (1970) (holding that "a voluntary act gratuitously undertaken must be completely performed with the exercise of due care under the circumstances"). Whether Whirlpool failed to exercise reasonable care in determining if Mr. Huffman's hemoglobin level fell into a "critical range," requiring notification to Mr. Huffman is a question of fact to be determined by a jury.

■ Likewise, although Whirlpool may not have undertaken a duty to provide complete diagnostic feedback to its employees, the record evidence indicates that it agreed to provide a health assessment to employees and their spouses and utilize

---

**2.** *See also* O.R.C. §§ 4113.03 ("fellow servant" rule not applicable); 4123.54 (workers' compensation for injured employees); 4123.74 (immunity of complying employees); 4123.77 (employer who fails to comply with section 4123.35 of the Revised Code is not entitled to the benefits of sections 4123.01 to 4123.94, but is liable to its employees for damages sustained in the course of employment and shall not avail itself of, among oth-

ers, the common law defense of the fellow servant rule).

**3.** Even if the fellow servant rule were not obsolete, it would not be applicable to the extent that plaintiff alleges Whirlpool acted in the dual capacity of Mr. Huffman's personal medical care provider, and not in the capacity of Mr. Huffman's employer.

the mini-physical to detect potential for disease and illness. (See Reinhart Deposition at 22–29; Walls Deposition at 24–25, 48–49). Thus, whether Whirlpool exercised due care in providing health assessments and utilizing mini-physicals to detect potential for disease and illness is a question properly reserved for the trier of fact.

■ Lastly, Whirlpool argues that plaintiff is barred from recovery by contributory negligence.[4] Summary judgment in a defendant's favor on the issue of contributory negligence, however, is appropriate only when there is "no dispute as to any material fact" and "the plaintiff's negligence [is] so extreme as a matter of law that no reasonable person could conclude that the plaintiff was entitled to recover." Collier v. Northland Swim Club, 35 Ohio App.3d 35, 39, 518 N.E.2d 1226 (1987). Based on the record evidence in this case and viewing the facts most favorably toward plaintiff, summary judgment would be inappropriate.

## IV.  Plaintiff's Causation Expert

SmithKline Beecham and Whirlpool argue that they are entitled to summary judgment because plaintiff has no admissible evidence of causation. In other words, defendants contend that even if plaintiff could show that defendants' conduct was somehow negligent, plaintiff cannot show that this reduced Mr. Huffman's chances of surviving colon cancer.

Defendants base their position on the reliability of plaintiff's only causation expert, Dr. Cole. In particular, defendants contend that Dr. Cole's opinion testimony on the issue of causation should be excluded because 1) her reasoning and methodologies fail to comply with the requirements set forth in Daubert v. Merrell Dow Pharmaceuticals Inc., 509 U.S. 579, 591–592,

113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), and 2) her testimony does not meet the requisite burden of proof under Roberts v. Ohio Permanente Medical Group, Inc., 76 Ohio St.3d 483, 668 N.E.2d 480 (1996). I disagree.

### A.  Daubert Analysis

The Federal Rules of Evidence permit opinion testimony by experts when the witness is "qualified as an expert by knowledge, skill, experience, training, or education" and "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue." Fed.R.Evid. 702.

■ In Daubert, the Supreme Court examined the standard for admitting expert testimony and held that trial judges should determine "whether the reasoning or methodology underlying the testimony is scientifically valid and ... whether that reasoning or methodology properly can be applied to the facts in issue." Daubert, 509 U.S. at 592–593, 113 S.Ct. 2786; see also Kumho Tire Company, Ltd. v. Carmichael, 526 U.S. 137, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999) (extending the Daubert gatekeeping obligation to all expert testimony).

This two-step inquiry requires trial judges to assess the relevance and the reliability of the expert's testimony. Id. at 592–593. The relevance requirement ensures that there is a proper "fit" between the testimony and the issue to be resolved by the trial. See United States v. Bonds, 12 F.3d 540, 555 (6th Cir.1993). The reliability requirement is designed to focus on the methodology and principles underlying the testimony. Id. at 556.

Though the Supreme Court in Daubert listed several factors to be considered in assessing the reliability of expert testimony,[5] it emphasized that the trial judge's

4. Although Whirlpool makes this argument in its reply brief only and plaintiff has not had the opportunity to respond, I shall address the issue of contributory negligence in a light most favorable to plaintiff.

5. Factors to consider in assessing expert testimony are 1) the ability to test the opinion; 2)

inquiry under Fed.R.Evid. 702 is a flexible one. Different approaches may be permissible, but the focus must be on the principles and methodologies on which the expert's opinion is based, and not on the merits of the expert's conclusions. *Daubert,* 509 U.S. at 594–595 n. 12, 113 S.Ct. 2786.

■ Defendants' objections to the admissibility of Dr. Cole's expert testimony focus on the second part of the *Daubert* test—the reliability factor. Defendants do not challenge Dr. Cole's qualifications to testify as an oncologist, but, instead, argue that Dr. Cole's opinions on causation should be excluded because her reasoning and methodologies are unreliable. I disagree.

Defendants' contention that Dr. Cole did not base her opinion on reliable scientific principles and methodologies is not persuasive. Dr. Cole grounds her opinion on a range of factors, including her care and treatment of Mr. Huffman, his medical history (as he related it to her and as derived from Dr. Echavarre's post-surgical report), her training and experience, and the use of the Duke's staging system. Defendants' objections to Dr. Cole's use of the Duke's staging system and her lack of textual authority go to the weight of her opinion, not its admissibility. *See Daubert,* 509 U.S. at 596, 113 S.Ct. 2786 ("Vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.").

Dr. Cole was Mr. Huffman's treating physician and is an experienced medical doctor who is board certified in the sub-speciality of medical oncology. Her background, as well as her methodologies and principles, are sufficient to permit her expert testimony on the issue of causation in this case. *See, e.g., Laski v. Bellwood,* 1997 WL 764416, *3, 132 F.3d 33 (6th Cir.

Nov.26, 1997) (unpublished opinion) (district court erred under abuse of discretion standard by not admitting opinion testimony from treating physician on issue of causation); *Westberry v. Gislaved Gummi AB,* 178 F.3d 257, 263–266 (4th Cir.1999) (physician's testimony on cause of plaintiff's sinus problem, which was based on differential diagnosis and temporal relationship between events, was admissible under *Daubert* ); *McCullock v. H.B. Fuller Co.,* 61 F.3d 1038, 1043 (2nd Cir.1995) (doctor was qualified under *Daubert* to give expert opinion on cause of throat ailment based on experience as medical doctor and certification in field of otolaryngology); *Carroll v. Morgan,* 17 F.3d 787, 790 (5th Cir.1994) (doctor was qualified under *Daubert* to give an expert opinion on standard of medical care based on thirty years of experience as a practicing, board-certified cardiologist and his review of medical records); *Hopkins v. Dow Corning Corp.,* 33 F.3d 1116, 1125 (9th Cir.1994) (district court properly admitted expert testimony under *Daubert* that was based on, among other things, the doctor's clinical experience and review of the medical records). Accordingly, I shall deny defendants' motions for summary judgment under *Daubert.*

## B. *Roberts* Analysis

■ Defendants also argue that Dr. Cole's testimony should be excluded because it does not meet the requisite burden of proof under *Roberts v. Ohio Permanente Medical Group, Inc.,* 76 Ohio St.3d 483, 668 N.E.2d 480 (1996). I disagree.

In *Roberts,* the Ohio Supreme Court held that an executor could maintain an action for a decedent's diminished chance of recovery or survival by presenting medical expert testimony that the defendant's negligent act or omission increased the risk of harm to the plaintiff. *Id.* at 488, 668 N.E.2d 480. "Once this burden is met, the trier of fact may then assess the de-

---

peer review and publication, 3) potential rate of error; and 4) general acceptance in the

relevant scientific community. *Daubert,* 509 U.S. at 593–594, 113 S.Ct. 2786.

gree to which the plaintiff's chances of recovery or survival have been decreased and calculate the appropriate measure of damages." *Id.* In addition, the "plaintiff is not required to establish the lost chance of recovery or survival in an exact percentage in order for the matter to be submitted to the jury. Instead, the jury is to consider evidence of percentages of the lost chance in the assessment and apportionment of damages." *Id.*

Here, plaintiff's expert, Dr. Cole, testified that, to a *"high degree of medical certainty,"* the delay in diagnosing Mr. Huffman's colon cancer diminished his chances of survival. (*See, e.g.,* Deposition of Dr. Cole at 142) ("My opinion is that, with a high degree of medical certainty, was that his survivability was higher in January of '98 . . ."). It is, therefore, clear that Dr. Cole has testified in accordance with the requirements of *Roberts* and the matter should be submitted to a jury.

Accordingly, I shall deny defendants' motions for summary judgment.

### CONCLUSION

It is, therefore,

ORDERED THAT

1. SmithKline Beecham Clinical Laboratories, Inc.'s motion for summary judgment is denied; and

2. Whirlpool Corporation's motion for summary judgment is denied.

So ordered.